291 N.J. Super. 98 (1996)
676 A.2d 1143
DR. MYRON A. MEHLMAN, PLAINTIFF-RESPONDENT-CROSS-APPELLANT,
v.
MOBIL OIL CORPORATION, A NEW YORK CORPORATION, DEFENDANT-APPELLANT-CROSS-RESPONDENT, AND F.M. CUNNINGHAM, C.R. MACKERER, IRIS KAPLAN, NORMAN MORGAN AND K.A. TORTORIELLO, DEFENDANTS. MOBIL OIL CORPORATION, DEFENDANT-THIRD-PARTY-PLAINTIFF,
v.
PRINCETON SCIENTIFIC PUBLISHING CO., INC., THIRD-PARTY-DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued April 22, 1996.
Decided June 13, 1996.
*102 Before Judges PETRELLA, P.G. LEVY, and EICHEN.
Michael E. Tigar of the District of Columbia Bar, admitted pro hac vice, argued the cause for appellant-cross-respondent (Smith, *103 Stratton, Wise, Heher & Brennan, attorneys; William J. Brennan, III, of counsel and on the brief; Penny A. Bennett, also on the brief).
Neil N. Mullin argued the cause for respondent-cross-appellant (Smith Mullin, P.C., attorneys; Mr. Mullin, of counsel and on the brief).
The opinion of the court was delivered by PETRELLA, P.J.A.D.
Plaintiff, Dr. Myron A. Mehlman, and the individual defendants were employees of defendant Mobil Oil Corporation (Mobil). Mehlman claimed that Mobil had discharged him in retaliation for his objecting to excessive levels (over 5%) of benzene, a toxic substance, in gasoline produced and sold by Mobil's subsidiary in Japan. Mehlman brought suit under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8. A jury returned a verdict in his favor and awarded him $3,440,300 in compensatory damages and $3,500,000 in punitive damages.
The trial judge granted Mobil's motion for judgment notwithstanding the verdict on the ground that Mehlman had failed to identify a clear mandate of public policy which he reasonably believed Mobil had violated, as required by CEPA. See N.J.S.A. 34:19-3c(3). The judge was reluctant to give CEPA extraterritorial effect. Nevertheless, because the judge considered Mobil's conduct outrageous, he amended the complaint to conform to the evidence supporting a prima facie tort claim and entered judgment for Mehlman on that claim. As a result, the judge granted Mehlman only the amount of punitive damages that the jury had awarded. On this appeal, Mobil challenges the prima facie tort award and defends the dismissal of the CEPA claim as mandated by the Commerce Clause. Mehlman cross-appeals, seeking reinstatement of his CEPA award and reversal of the pretrial dismissal of his defamation claim.
*104 Mehlman's complaint alleged, among other things, that (1) Mobil had violated CEPA and wrongfully terminated his employment in violation of Mobil's regulations and the parties' employment contract, and (2) Mobil and the individual defendants had defamed him. His complaint asserted that while conferring with Mobil employees in Japan in the fall of 1989, Mehlman had warned them that they should reduce benzene levels in Mobil gasoline because the chemical "posed a serious threat to the public health and environment...." Mehlman's employment was terminated immediately upon his return from Japan.
Mobil denied the material allegations of Mehlman's claims, asserting that it had terminated him for just cause, and counter-claimed that he had misappropriated Mobil's assets and funds. It also filed a third-party complaint against Princeton Scientific Publishing Co., Inc., a company owned by Mehlman's wife.[1]
In March 1992, Mobil successfully moved to dismiss certain of Mehlman's non-CEPA claims against the individual defendants on the ground that they were barred by N.J.S.A. 34:19-8, which provides that a CEPA action waives other rights and remedies. As to the remaining claims, the judge denied Mobil's subsequent motion for summary judgment, which was based upon Mehlman's failure to cite any law, regulation or clear mandate of public policy that Mobil had violated. See N.J.S.A. 34:19-3. The case proceeded to trial.
We conclude that the trial judge erred in vacating the jury award on the CEPA claim. Although we reject Mobil's due process objections to the post-trial amendment of the complaint, we agree that the prima facie tort claim is barred by the CEPA waiver provision because it was based upon the same retaliatory discharge as the CEPA claim. On the other hand, since Mehlman's *105 defamation claim was independent of his CEPA claim, the judge erred in dismissing it. Hence, for the reasons hereinafter stated, we affirm in part, reverse in part, and reinstate the jury verdict and damage awards.

I.
A proper understanding of the case necessitates a somewhat lengthy discussion. Mehlman earned his Ph.D. at the Massachusetts Institute of Technology in 1964. He served as a postdoctoral fellow at the University of Wisconsin's Institute for Enzyme Research and thereafter as an associate professor of biochemistry at Rutgers University and a professor of biochemistry at the University of Nebraska. In succession, Mehlman worked as Chief of Biochemical Toxicology for the Bureau of Foods in the U.S. Food and Drug Administration; as Special Assistant for Toxicology, Nutrition and Environmental Affairs in the Office of the Assistant Secretary for Health in the U.S. Department of Health, Education and Welfare; and, as Special Assistant and Liaison Officer for the Office of the Director of the National Institutes of Health.
In 1976, Mobil recruited Mehlman as Director of Environmental Health and Toxicology in its Medical Department. He was promoted in 1978 to Director of Toxicology and Manager of the Environmental Health and Science Laboratory in Mobil's Princeton-based Department of Environmental Affairs and Toxicology. Shortly after he became Mobil's toxicology director and laboratory manager, Mehlman reported to John McCullough, General Manager of the Mobil Toxicology Division's Environmental Affairs and Toxicology Department and Vice President of the Mobil Research and Development Corporation (MRDC).[2] In his new capacity, Mehlman established a laboratory, which began operating around *106 1980 or 1981 with a staff of over 100 people. Between 1981 and 1985, Mehlman's level of responsibility had increased so as to give him full authority in all of his job tasks except assisting other departments. Mehlman's duties included representing Mobil on toxicology matters and providing "toxicologic[al] and regulatory advice for prudent business decisions."
Mehlman's curriculum vitae includes some 200 books and articles written and published in the fields of toxicology and biomedical science. He authored various articles on benzene and chaired several symposia on the harmful effects of gasoline vapors. In addition, Mehlman helped to found the American College of Toxicology, of which he served as president, and the Collegium Ramazzini, of which he served as an officer and a director. He has belonged to many professional societies, enjoying numerous editorial appointments, professional committee assignments, and symposia chairmanships.
According to Mehlman's 1988 job description, the laboratory that he managed "ha[d] full responsibility for toxicology testing for Mobil Corporation...." As the only one performing toxicological testing for Mobil's affiliates, Mehlman's laboratory received praise from Mobil's senior managers as well as outside scientists. The key speaker at a 1986 Clean Air Conference described it as "magnificent." In April 1987, D'Ambrisi thanked Mehlman for the "positive overtones" of a magazine article written about the laboratory. The record reflects that Mehlman's job performance appraisals were excellent, including one given just five months before he was terminated. Based upon his performance, Mehlman received annual merit raises and stock options from Mobil.[3] In addition, Mobil's vice president of research nominated him to the National Academy of Sciences in May 1989. The nomination described Mehlman as "an international expert in toxicology [who] *107 is often consulted on issues involving the toxicity of chemicals in relation to environmental health."
The genesis of the present controversy was Mehlman's participation in the organization of the First Pacific Cooperative Symposium, "Industrialization and Emerging Environmental Health Issues  Risk Assessment and Risk Management," held in 1989 at the University of Japan. Mehlman explained that the symposium could have impacted upon company business in Japan, which Mobil transacted through its wholly-owned affiliate, Mobil Sekiyu Kabushiki Kaisha (MSKK), because Japanese regulatory people were expected to attend and speak. When Silvestri approved Mehlman's attendance, Mobil's International Administration arranged for him to discuss toxicology and environmental health issues at MSKK during his visit to Japan.
On September 27, 1989, Mehlman met with MSKK management at Mobil headquarters in Tokyo and gave a slide presentation on the health effects of gasoline. One slide showed the concentration of benzene in gasoline in the United States, Japan, and Europe. When Mehlman finished his presentation, MSKK Technical Manager Takashi Tsunemori asked to see this slide again. Tsunemori informed Mehlman that he had inaccurately reported Japanese benzene levels at 2.5% to 3.5% for regular gasoline and 2.5% to 4.6% for premium gasoline. According to Mehlman, Tsunemori informed him that the benzene level in Japanese gasoline was 5.7% or 5.8%.
Mehlman testified that he told Tsunemori that benzene was "a very poisonous chemical  dangerous and toxic. And [these] concentrations are too high. [T]hey have to be reduced." Mehlman asked Tsunemori whether the Japanese regulatory agency was aware of these benzene levels. Tsunemori allegedly responded, "We do not have to tell them." Mehlman contends that he reiterated that "this is much too dangerous and you must reduce it" and that Tsunemori answered that the levels could not be reduced because of old equipment that would cost "several hundred million dollars to change [a] single refinery to produce a *108 product with low levels of benzene." Mehlman advised Tsunemori to "reduce it or do not sell it," which left those in attendance "shocked and surprised." At trial, Tsunemori recalled attending Mehlman's slide presentation, but denied having told him that the benzene level of regular gasoline sold by MSKK was 5.7% or 5.8%.
John Drummond, of Mobil Oil International, explained that MSKK had purchased its gasoline from at least three different refineries, the one in question being the Chiba refinery.[4] Tsunemori produced monthly test reports for that refinery from May 1988 through December 1989, showing the monthly volume percentage of benzene produced in that period. From May 1988 through April 1989, the monthly benzene levels were between 4.5% and 4.7%.[5] The level from May 1989 through September 1989 was 4.5%. On cross-examination, Tsunemori admitted that these batch reports showed only the "typical" benzene levels for each month without showing their actual range.
Mehlman explained that hydrocarbons, including benzene, vaporize from gasoline mixtures into the air and condense into liquid form that contaminates other water sources. He noted that benzene also reaches water sources through gasoline spills. Based upon an article published in 1988 by a foremost epidemiologist, Mehlman testified that human exposure to mixtures containing benzene, a carcinogen, causes myelogenous leukemia. He referred to a Consumer Product Safety Commission regulation, amended in 1988, which provided that:
Because inhalation of the vapors of products containing 5 percent or more by weight of benzene may cause blood dyscrasias, such products shall be labeled with the signal word "danger," the statement of hazard "Vapor harmful," the word "poison," and the skull and crossbones symbol....
[16 C.F.R. § 1500.14(b)(3)(i)].
*109 Mehlman indicated that MSKK had no warnings on its gasoline in 1989, however, despite the fact that blood dyscrasia, the disturbance of normal blood cells, leads to various diseases including leukemia. He stated that the United States had imposed controls, such as catalytic converters in automobiles and vapor containment systems for the transportation of gasoline, which Japan had not yet adopted. In fact, he noted that the Occupational Safety and Health Administration had enacted a regulation in 1987, which had reduced permissible benzene exposure in the workplace from ten parts per million to one part per million.
Citing his job responsibility to monitor the toxicity of his employer's products, Mehlman testified that he believed that New Jersey law prohibited MSKK from marketing gasoline with benzene levels over 5%. He felt that "many people would die from this ... unnecessary overexposure, because we knew how to correct it." Mehlman also feared the impact of product liability acknowledged in a February 1987 draft paper forwarded by McCullough to D'Ambrisi on "Potential Health Effects of Gasoline  An Update." The paper concluded that "[t]he greatest potential, and unestimable, cost of a governmental finding that exposure to gasoline causes cancer in humans would arise from personal damage claims." Mehlman was additionally concerned about his own possible professional negligence in the event that he failed to inform Mobil of the benzene risk.[6]
Mehlman also referred to an April 1977 interoffice memo about benzene sent to the president of Mobil Marketing and Refining. The memo recalled how benzene "has been considered toxic," possibly carcinogenic, and that containers with 5% or more benzene *110 were required to have a "poison" label as a result. The memo warned that reduction of the benzene level in Mobil's gasoline and other products could cost Mobil hundreds of millions of dollars.
In August 1983, McCullough had sent then MRDC President J.E. Penick a memo enclosing a background paper on benzene, which similarly stated that "[m]ajor investment would be required to reduce the benzene content below one percent, especially overseas." The paper indicated that "[h]ealth and safety requirements in the future will not differ much wherever we operate." Accordingly, Mobil had pledged in its "Policy on Product Safety Stewardship" that "[i]n the absence of adequate local government requirements, Mobil affiliates will maintain standards of safety and health protection that consider scientific knowledge and established practices in developed countries."
Mehlman asserted that the "Japanese [have] usually cop[ied] American regulation," such as by removing lead from gasoline and using seat belts. He thus "naturally assumed that they would follow the same regulation with respect to benzene because they're very quick in accepting certain standards to protect their population...." At trial, he referenced a 1974 Japanese Environment Agency Notification regarding benzene in drinking water.[7] Mehlman admitted, however, that he was unaware of this specific regulation when he spoke in Japan in 1989. Even so, Drummond stated that the Japanese Petroleum Association, which "looks after ... the interests of the oil industry members operating in Japan," had voluntary guidelines establishing 5% as the maximum benzene content of gasoline during 1988 and 1989. MSKK was a member of the Japanese Petroleum Association and, according to Tsunemori, was obligated to obey its guidelines.
*111 After his meeting at MSKK, Mehlman attended the First Pacific Cooperative Symposium from October 1 to October 5, 1989. During his presentation, Mehlman showed the same benzene slide, commenting that the levels were between 3.5% and 5% in Japanese gasoline. Mehlman refrained from objecting to the high levels of benzene at the conference because he had not yet had an opportunity to speak to his superiors. He was "very concerned" about people being injured and "really astonished that knowing what we know today, that these levels existed in Mobil's gasoline." Mehlman intended to raise the issue with Mobil as soon as he returned from Japan.
Mehlman arrived home from Japan late in the evening of Friday, October 6, 1989, to learn that Silvestri had called. When Mehlman returned his call the following morning, Silvestri informed him that Mobil had received information about a possible conflict of interest on Mehlman's part involving his wife's publishing company, which had prompted an investigation that necessitated placing him on "special assignment indefinitely." His home became his work place as his access to Mobil's premises was restricted. Silvestri also asked Mehlman not to "call anyone at the lab" and would not allow Mehlman to respond. Silvestri corroborated Mehlman's version of this conversation.
In May 1989, Mobil had retained Kymn and Company, a management consulting firm owned by Kymn Rutigliano, to improve employee communications within the lab. In the course of interviewing employees, Rutigliano had heard allegations that Mehlman was misusing Mobil's assets for his personal gain. According to Rutigliano, she called Silvestri on September 20 or 21, who asked her to deliver a report on this matter to him by September 28. Silvestri confirmed the accuracy of this conversation, saying he wanted the report quickly because "I thought I had a hot potato in my hands and I wanted to pass that potato to my boss [D'Ambrisi] as quickly as possible."
Rutigliano reported that employees had accused Mehlman of using Mobil's personnel and supplies, including postage, for his *112 publishing business; of hiring consultants for his personal lawsuits at Mobil's expense; of obtaining Mobil grants for his publishing patrons; and, of promoting only employees who agreed to assist with publishing activity on company time. She also stated that several individuals had attempted to alert senior management to these problems, but were unsuccessful in doing so. Rutigliano recommended an internal security investigation, a possible reorganization, removal of Mehlman from the laboratory, and counselling for his staff. She conceded that "[g]iven this can be viewed as a grey area since technical publishing and related activities can benefit Mobil, I urge you to be rigorous in drawing the line as to what is acceptable and what is not." Rutigliano was surprised by how fast Silvestri left his office to deliver her report to D'Ambrisi in light of the lack of success experienced by others who had tried to bring this issue to Mobil's attention.
When D'Ambrisi received Rutigliano's report, he immediately authorized an internal investigation into the accusations against Mehlman. D'Ambrisi, Silvestri, MRDC General Counsel John Blay, MRDC Personnel Manager Robert Meyer, and MRDC Security Manager Paul Geneas met on September 29 to review Rutigliano's report. Blay indicated that those in attendance thought that Mehlman had been "perhaps wrongfully" accused and wanted to proceed quickly to "clear it up" before Mehlman returned from Japan so that his work at the laboratory could continue. He stated that there had been no discussion of the nature of Mehlman's presentations in Japan. By the time Mehlman was due back from Japan, however, the investigation, conducted by Geneas, had produced substantial material against him.
Silvestri later asked McCullough whether he had authorized Mehlman "to use Mobil assets for the benefit of Princeton Scientific," to which McCullough answered that he had not. When Silvestri relayed this information to D'Ambrisi, they agreed to read Mehlman the written statement that Silvestri had prepared. Silvestri denied that anyone had told him or D'Ambrisi of Mehlman's remarks to the MSKK managers at the time that the *113 supervisors decided to place him on special assignment. They hoped to avoid embarrassing him and to expedite the investigation then underway.
On October 12, Silvestri met with Mehlman and personnel employee Gary Habla to review the allegations and to give Mehlman an opportunity to respond. Silvestri told Mehlman that he was accused of relying on his subordinates to examine papers for Princeton Scientific; employing Mobil's mail system to send out Princeton Scientific books and documents; spending Mobil's petty cash on stamps for Princeton Scientific; utilizing the services of Mobil's personnel for Princeton Scientific; using Mobil's materials and graphics equipment for brochures for Princeton Scientific; paying honoraria to laboratory visitors when they provided services for Princeton Scientific; providing Mobil grants to people who were doing things for Mehlman; and, submitting irregular travel and entertaining expense account forms. Mehlman denied some of the allegations and had no comment on others. Mehlman was neither given a written copy of the Rutigliano report nor allowed access to the laboratory to obtain records pertinent to the investigation. Instead, another meeting was scheduled for October 24 to afford Mehlman, with his attorney present, an opportunity to tell his "side of the story."
On or about October 16, Geneas finished his interviews of Rutigliano, McCullough, and fifteen employees supervised by Mehlman. On October 19 or 20, Silvestri convened a meeting with D'Ambrisi, Blay, Meyer, and Geneas, at which he recommended that Mehlman be relieved as manager of the laboratory because "he had abused the trust that we would put into him in that position." D'Ambrisi decided that Mehlman would be offered two choices: either make restitution and resign or be terminated for cause. An October 20 memo from D'Ambrisi to Mobil President Robert Tucker accused Mehlman of misconduct and concluded that "we have no recourse but to sever Mr. Mehlman's relationship with Mobil." Blay and Silvestri recalled, however, that D'Ambrisi had agreed to take no final action until Mehlman was *114 given an opportunity to explain himself on October 24. Nevertheless, Mehlman canceled the meeting on the morning of October 24 and, through counsel, declined to reschedule it. Geneas considered an interview with the accused "absolutely critical" and represented that he would have included Mehlman's comments in his report. Geneas maintained that he had planned to provide Mehlman with a copy of his report at the October 24 meeting.
According to an October 24 "Investigative Inquiry" prepared by Geneas, Mehlman had utilized Mobil personnel and resources to run his wife's publishing business. Acknowledging that the endeavor had operated at a loss, the report noted that it had nonetheless enhanced Mehlman's "personal prestige." Although Mehlman had agreed to terminate his publishing activity in 1985, he allegedly had failed to do so. Highlights of the report included defendant K.A. Tortoriello, Mehlman's Executive Secretary, describing him as a "crook," and defendant Carl Mackerer, Mobil's Manager of Toxicology Services, accusing him of spending most of his time on his publishing business and of ignoring the laboratory.
On cross-examination, Geneas admitted that he had omitted several exculpatory statements from his report. Mehlman produced checks given to a Mobil employee, which refuted her reported accusation that Mobil had paid her for working for Princeton Scientific. McCullough acknowledged that Princeton Scientific Publishing Company had not interfered with Mehlman's job performance and conceded that the issue had never been mentioned on his annual performance appraisals.
D'Ambrisi asserted that he made the final decision to terminate Mehlman in late October 1989. He claimed to have had no knowledge of Mehlman's remarks to MSKK representatives at the time he decided to fire him. As a result, D'Ambrisi told Silvestri to meet with and terminate Mehlman unless he provided documentation authorizing his use of Mobil's assets for the benefit of Princeton Scientific. Silvestri met with and terminated Mehlman on November 2 after he made no attempt to defend himself. On November 8, Silvestri wrote to Mehlman terminating his employment *115 for cause as of the date of their meeting. Mobil never provided Mehlman with any written reports or evidence against him until he filed suit.
Denying that he had made Princeton Scientific mailings at Mobil's expense, Mehlman explained that he frequently did mailings on behalf of professional organizations, whose meetings Mobil had paid him to attend on its behalf. Mehlman asserted that he had discussed his activities in these organizations with his supervisors.
Mehlman testified that Mobil had agreed when it offered him employment in 1976 to his continuing as editor of the Journal of Environmental Health and of the Journal of Toxicology as well as to his completion of several books. One of Mehlman's job tasks was "[e]stablish[ing a] high degree of credibility and reputation for Mobil worldwide in areas of toxicology and environmental health." According to Mehlman, this was accomplished by publishing, which enhanced his reputation and enabled him to deal on behalf of Mobil more effectively with regulatory agencies. In fact, several employees of the U.S. Environmental Protection Agency served as editors of Princeton Scientific publications. As a result, Mehlman noted that he was rated as clearly exceeding his job requirements in maintaining connections with government agencies, academia, and industry scientists.
Mehlman admitted that he had occasionally used Mobil's resources for Princeton Scientific, contending that he did so "when [he] thought it [would be] beneficial to Mobil" and with McCullough's knowledge and consent.[8] Mehlman pointed out that Mobil *116 had neither warned him that he should refrain from using its resources for publishing nor had criticized him for failing to do so. Even though Mehlman spoke to Silvestri at least every other day, Silvestri had never mentioned these concerns before Mehlman's 1989 trip to Japan. In Mehlman's view, there was no clear demarcation between work performed for Mobil and Princeton Scientific by Mobil employees because Mobil research papers were sometimes published in Princeton Scientific journals. He speculated that employees might have surmised from this that they were working for the publishing company when they were in fact working for Mobil.
At trial, Mehlman offered a 1980 memo from Mobil's Committee on Conflicts of Interest, which he had received following its review of his situation. The committee had concluded that Mehlman could continue publication of a professional journal and 50% ownership in the publishing company he then owned. Referring to "standing rulings" allowing publication of technical papers and management-approved outside teaching, the committee instructed Mehlman and his supervisors of their "mutual obligation" to comply with these directives, "particularly to insuring that no misuse of company information or facilities [would be] involved and the activities [did] not interfer[e] with the efficient performance of the employee's duties."
In October 1984, Mehlman submitted to McCullough a memo requesting a review of a possible conflict of interest based upon his own prior interest in various publishing companies. He attached lists of books and other publications with which he had been involved. In a responding "memo to file," a copy of which went to the MRDC President, McCullough concluded that Mehlman's publishing activity detracted from his job performance at Mobil even though no conflict of interest appeared to exist. Consequently, Mehlman agreed to divest himself of his publishing *117 activity by the end of 1985. Mehlman explained that he had attempted to sell Princeton Scientific to over 100 different publishers, but couldn't even give it away to Princeton University. Mehlman insisted that he had kept McCullough informed of his efforts to dispose Princeton Scientific verbally every month and in writing three or four times per year. McCullough claimed to have been unaware, however, of the fact that Princeton Scientific's business had increased after Mehlman had promised to divest himself of it by the end of 1985. Yet, D'Ambrisi also admitted that he was aware that Mehlman had been unable to sell his publishing business.
Mehlman said that he felt shocked and confused after being suspended and locked out of his laboratory. From October 7 to November 2, 1989, he was anxious, worried, ashamed, and unable to sleep. He had three daughters in college, a wife in professional school, and a mortgage to pay. Following his termination, Mehlman testified that he felt sick and horrible, stopped attending professional meetings, even of organizations he had founded and had previously enjoyed, and even avoided going into Princeton because of his embarrassment. Mehlman had worked long hours, including almost every weekend, to build his laboratory's national and international reputation. He was immensely proud of it. As a result, he compared losing his laboratory to "losing a child."
Mehlman produced an economist who appraised Mehlman's past wage losses for the period of 1990 to 1994 at $524,974, the value of what he would have earned from Mobil less what he had actually earned. Mehlman's future wage losses between 1994 and his proposed retirement in six years at age sixty-five were calculated to be $132,000 per year. Mehlman's loss of pension and stock options, both reduced to present value, were set at $373,326 and $105,000, respectively.
The jury found that Mehlman had proved "that he objected to any activity, policy or practice that he reasonably believed was incompatible with a clear mandate of public policy concerning the public health, safety or welfare," and that Mobil had retaliated *118 against him for doing so. As a result, it awarded him $2,565,300 for his financial loss and $875,000 for his emotional distress. Upon further finding that Mehlman was entitled to punitive damages, the jury also awarded him $3,500,000 after the parties had stipulated Mobil's net worth to be $11,986,000,000 and its gross revenue in the past twelve months to be $60,522,000,000. Although Mobil "had a policy that prohibited termination except for good cause," the jury decided that Mobil had not violated that policy. After the jury returned its verdict, the judge indicated that he might set it aside because CEPA did not appear to him to apply to a statement made in Japan. The judge also advised that he might amend the complaint to conform to the evidence as supporting a "prima facie tort."
Mobil moved for judgment notwithstanding the verdict, reasserting its mandate of public policy argument. Mehlman cross-moved, contending that the complaint should be amended to conform to the proofs. The judge set aside the verdict as not based upon a clear mandate of New Jersey public policy that Mehlman reasonably believed Mobil to have violated. Nevertheless, the judge decided that the punitive damages award was justified. He granted Mobil's motion and entered final judgment in its favor on September 14, 1994, on the counts in the complaint as previously awarded. Pursuant to R. 4:9-2, however, the judge also ordered sua sponte that the complaint be amended "to include a claim in prima facie tort in favor of Mehlman and against Mobil for punitive damages in the amount of $3,500,000...." Mobil's counterclaim against Mehlman and its third-party complaint against Princeton Scientific Publishing Co. were dismissed. Enforcement of the judgment was stayed pending appeal.

II.
In order to explicate our decision in a more logical fashion, we deal first with Mehlman's cross-appeal.

*119 A.

Mehlman argues that he has identified several clear, relevant mandates of public policy applicable to Mobil's conduct.[9] He contends, therefore, that the trial judge erred in ruling to the contrary.[10]
The trial judge opined that "while environmental protection is humanitarily correct, our legislature did not contemplate incorporating the biblical golden rule into its statute." He had previously referred to the "amorphus concept of thou shalt not kill earthlings with benz[e]ne...." The judge asserted that New Jersey employers should be able "to ascertain a bright line" regarding a clear mandate of public policy and should not be required "[t]o consult the [B]ible and Collegium Ramazzini and Hippocratic oath in order to ascertain what they should do in connection with statements made by their employees...."
The judge also thought that a clear mandate of New Jersey policy should "actually affect New Jersey citizens," but that "[t]he impact of 5 percent benzene is, at best, remote and conjectural" because "New Jersey is on the other side of the world from *120 Japan," thus making the impact of excessive benzene "at best, remote and conjectural." He indicated that Japan, a "sophisticated society," could make its own environmental laws and regulations. In enacting CEPA, the judge reasoned, the Legislature had not intended to "impose upon its corporations here in New Jersey an obligation to adhere to the highest forms of environmentally protective conduct."
I still don't see why we should say to our companies competing on an international level, we're going to tie your hands behind your back, it's okay for Japanese companies selling gas to go beyond the 5.0 percent, but we're not going to let Mobil or Esso do that.
In deciding Mobil's motion for judgment notwithstanding the verdict under R. 4:40-2, the trial judge was required to determine whether the evidence, together with the legitimate inferences therefrom, could sustain a judgment in favor of Mehlman. Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969). The evidence supporting Mehlman's position had to be accepted as true, and Mehlman should have been accorded the benefit of all inferences which could reasonably have been drawn from the evidence. Ibid.
Mobil contends that the mandate of public policy required by N.J.S.A. 34:19-3c(3) must be clear and specific to the employer's conduct, so that the defendant-employer has "reasonable notice of when it is prohibited from terminating an employee." Mobil further urges that this mandate must be the basis of Mehlman's objection to its conduct when the objection is made. Finally, Mobil maintains that the clear mandate of public policy must have an intended and permissible extraterritorial effect, which CEPA did not possess.
Mobil relies upon Abbamont v. Piscataway Tp. Bd. of Educ., 138 N.J. 405, 650 A.2d 958 (1994), and Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1980). In Abbamont, supra, 138 N.J. at 410, 650 A.2d 958, a non-tenured industrial arts teacher claimed that his employer had retaliated against him by denying him re-employment because he had complained about inadequate ventilation in his workshop. The Court found that *121 regulations respecting ventilation in industrial arts programs, which were incorporated into the school board's "official safety guide," "directly and specifically addressed matters of health and safety and fully reflected a mandate of public policy relating to general concerns of health, safety and environmental protection." Id. at 424, 650 A.2d 958. Moreover, the Court determined that the plaintiff had shown "a reasonable, objective belief" that school officials had specifically violated these regulations, thereby rendering their conduct "incompatible" with a public policy mandate. Ibid. Although its opinion dealt primarily with the liability of the school board for the actions of its officials and the availability of punitive damages, the Court also decided that
plaintiff's complaints were, as required under CEPA, based on a reasonable belief that the conditions in the metal shop were in violation of an administrative "regulation promulgated pursuant to law" and were contrary to "a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment."
[Id. at 423, 650 A.2d 958].
Abbamont did not read N.J.S.A. 34:19-3c as requiring actual knowledge of a specific legal mandate.[11] Even though the specific legal mandate in Abbamont also constituted a public policy, the Court did not comment upon whether Abbamont was aware of the applicable regulation at the time that he made his objections known. Abbamont knew there had to be regulation of air quality and ventilation in a school shop when he "expressed concern about the poor health and safety conditions of the metal shop, including *122 ... lack of air ventilation...." Id. at 410, 650 A.2d 958. He apparently was unable, however, to cite the specific regulation. Nevertheless, his belief that there had been a violation was both reasonable and objective. Id. at 424, 650 A.2d 958.
Mobil maintains that an employee must have a "particular reason for objecting" lest CEPA becomes an "invitation" for plaintiff's lawyers "endlessly to search the law libraries" for mandates of which a plaintiff had never heard but might now assert reliance. According to Mobil, the clear mandate of public policy "must exist," Mehlman "must have believed it existed," and "that belief must have been reasonable."
This is precisely what occurred here. The clear mandate of public policy derived from federal regulations and New Jersey product liability law was effective in Japan through the operation of the Japanese Petroleum Association guideline and the Japanese Environmental Agency Notification. Although Mehlman was not specifically aware of either of these sources when he voiced his objection in Japan in September 1989, he nonetheless reasonably believed that such clear mandates existed. Mehlman offered examples at trial of how the "Japanese usually copy American regulation," thereby demonstrating a basis upon which he had "naturally assumed that they would follow the same regulation with respect to benzene...." The Japanese Petroleum Association guideline was thus, as Mehlman describes, "an objective referent which evidences the reasonableness of his belief."
Mobil concedes that CEPA "does not require a plaintiff to know, to a legal certitude, the precise contours and components of the public policy." Just as the plaintiff in Abbamont knew without citing to the New Jersey Administrative Code that the State regulates air quality and ventilation in public school workshops, Mehlman appreciated that there had to be Japanese regulation of benzene content in gasoline which parallelled regulations promulgated in the United States. We reject, therefore, Mobil's argument that Mehlman's inability to cite a precise regulation is fatal to his case.
*123 Mobil argues that the Japanese Petroleum Association guideline was not binding. Mobil's own witness, MSKK Technical Service Manager Takashi Tsunemori, testified that his boss was responsible for compliance with the Japanese Petroleum Association guideline. Mehlman was entitled to the benefit of this favorable evidence in defending against Mobil's motion for judgment notwithstanding the verdict.
Likewise, Mobil's contention that there was no violation of the Japanese Petroleum Association guideline because benzene levels were under 5% is without merit. There was testimony that Tsunemori had informed Mehlman that the benzene levels in Japanese gasoline were 5.7% or 5.8%. Mobil also dismisses the Japanese Environmental Agency Notification because it regulates water but not gasoline. Mehlman explained, however, that gasoline vapors escape into the air during transport, return in rainfall, and concentrate in water. In uncontroverted testimony, Mehlman observed that Japan, unlike the United States, has not attempted to control this process through the use of catalytic converters. Mehlman's connection between benzene contamination and ground water was thus sound. Mehlman is again entitled to the benefit of his own favorable testimony on these points.
Mobil is mistaken that the clear mandate of public policy must prohibit the specific conduct of the employer in question. See, e.g., Hennessey v. Coastal Eagle Point Oil Co., 129 N.J. 81, 98-99, 609 A.2d 11 (1992) (private employee's right to privacy may serve as predicate of clear mandate of public policy undergirding wrongful discharge claim). The statute requires the employee to have reasonably believed that the employer's conduct had either violated a law, rule or regulation, or had been incompatible with a clear mandate of public policy. N.J.S.A. 34:19-3c. The sine qua non of a CEPA claim is not the actual occurrence of a violation of promulgated authority or public policy, but rather the existence of a reasonable belief to the effect that such authority or policy has been breached. D'Agostino v. Johnson & Johnson, Inc., 133 N.J. 516, 542, 628 A.2d 305 (1993); see Delran Educ. Ass'n v. Delran *124 Bd. of Educ., 277 N.J. Super. 538, 543-544, 650 A.2d 7 (App.Div. 1994) (regulation governing access to teacher's pupil records was sufficient basis to afford her reasonable belief that compliance with superintendent's order would constitute violation of regulation for purpose of CEPA claim). If the Legislature had intended that a plaintiff be required to cite a specific, applicable law, rule or regulation, then there would have been no need for the "clear mandate of public policy" provision of N.J.S.A. 34:19-3c(3). To impose a "specific conduct" requirement would eviscerate this provision.
Nor does Pierce v. Ortho Pharmaceutical Corp., supra, 84 N.J. 58, 417 A.2d 505, support Mobil's position.[12] A medical doctor employed to research therapeutic drugs, Pierce was terminated after refusing to work with a drug because it contained saccharin, which she thought might be harmful. Id. at 62-64, 417 A.2d 505. For the first time, the Court recognized a cause of action for employees wrongfully discharged from gainful employment "when the discharge is contrary to a clear mandate of public policy." Id. at 72, 417 A.2d 505. In denying Pierce relief based upon her reliance on her Hippocratic oath, the Court emphasized that she *125 had contended only that saccharin was controversial, not that it would harm anyone. Id. at 74, 75, 417 A.2d 505. The parties' dispute thus amounted only to "a difference in medical opinions." Id. at 75, 417 A.2d 505.
In contrast, there was no controversy here regarding the toxicity of benzene. Mehlman's uncontradicted testimony was that benzene levels in gasoline of 5.7% or 5.8% had to be reduced for safety and health reasons given the "very poisonous," "dangerous," and "toxic" nature of the chemical. Obviously, Mehlman was correct. See 16 C.F.R. § 1500.14(b)(3)(i); see also Mason v. Texaco, Inc., 741 F. Supp. 1472, 1482 (D.Kan. 1990) (identifying the link, revealed through scientific research, between benzene exposure and leukemia, among other cancers of the blood), aff'd in part and remanded, 948 F.2d 1546 (10th Cir.1991), cert. denied, 504 U.S. 910, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992). Mobil itself recognized in a 1977 interoffice memo that benzene was toxic. There can be no question but that the conduct to which Mehlman objected could have directly harmed many people as a result of "unnecessary overexposure." While the plaintiff in Pierce was raising an internal controversy, Mehlman was attempting to preserve health and save lives. Mobil mischaracterizes Mehlman's act as the mere "call of conscience" rejected by the Pierce Court. See Pierce v. Ortho Pharmaceutical Corp., supra, 84 N.J. at 75, 417 A.2d 505.
In addition, Pierce noted the plaintiff's failure to allege either a violation of a statutory regulation or an ethical principle or any possible exposure to malpractice as the result of her involvement in her employer's drug research. Id. at 64, 417 A.2d 505. Mehlman has shown here, on the other hand, that MSKK's excessive benzene levels violated the Japanese Petroleum Association guideline and would have violated a federal regulation in this country because of the absence of required warnings on MSKK gasoline. See 16 C.F.R. § 1500.14(b)(3)(i). Mehlman also expressed concern about his possible professional negligence arising from his wilful *126 disregard of the hazard that benzene exposure poses to the consuming public.
We agree with Mobil that the Pierce Court refused to consider any mandates of public policy that the plaintiff there had neither alleged in her complaint nor relied upon in defense of the employer's motion to dismiss her claim. See Pierce v. Ortho Pharmaceutical Corp., supra, 84 N.J. at 75, 417 A.2d 505. Mehlman contends that he did raise all of his alleged "mandates" either at trial or in his post-trial submissions. We will not entertain sources of public policy identified for the first time after trial, however, inasmuch as a verdict, dependent upon the finding by a jury of a reasonable belief, cannot be upheld on the basis of post-hoc rationalization.[13]
Notwithstanding this limitation, Mehlman testified that he was aware of the aforementioned federal regulation when he made his comments in Tokyo in September 1989. Although Mehlman could not cite any specific Japanese law or regulation, as noted earlier, he "naturally assumed" that the Japanese had in effect standards rivaling those established in the United States. Mehlman knew that Mobil had promulgated its own "Policy on Product Safety Stewardship," which pledged its adherence to safety standards established in the developed world. Japan is clearly a developed nation. As we read the policy, however, the purview of Mobil's pledge extends not only to undeveloped countries, but to nations lacking local standards as well. Due to the fact that the Japanese government had not yet approved limits on benzene levels in gasoline as of 1989, Mobil had obligated itself through its own policy to utilize in Japan established standards of safety and health protection.
*127 Mehlman has also explicated potential product liability and professional negligence consequences that could have ensued from his failure to act. He relies upon the comment in Soler v. Castmaster, Div. of H.P.M. Corp., 98 N.J. 137, 145, 484 A.2d 1225 (1984), that "`only safe products should be marketed.'" In addition, he emphasizes that a distributor of harmful products has a duty to adequately warn unsuspecting consumers of the risk of such harm. See Macrie v. SDS Biotech Corp., 267 N.J. Super. 34, 41, 630 A.2d 805 (App.Div.), certif. denied and appeal dismissed, 134 N.J. 565, 636 A.2d 522 (1993). Mobil counters that product liability law is too general and was not intended to have extraterritorial effect. Our Supreme Court has implied, however, that professional liability may be a relevant consideration in ascertaining a clear mandate of public policy. See Pierce v. Ortho Pharmaceutical Corp., supra, 84 N.J. at 75, 417 A.2d 505. Mobil's internal 1987 memo, "Potential Health Effects of Gasoline  An Update," warned of the cost that "personal damage claims" arising from cancer caused by gasoline exposure would exact on Mobil. Even if Mehlman had remained silent, Mobil might nonetheless have been held liable under Japanese law for selling a harmful product. By speaking out, Mehlman sought to defend against the possibility of product liability and of his own professional negligence arising from his failure to prevent benzene exposure. These were reasonable public policy considerations when Mehlman voiced his objection in Tokyo in September 1989.
Although excluded from evidence, the Society of Toxicology's Code of Ethics also bolsters Mehlman's CEPA claim as a professional code that serves both professional and public interests.[14]See id. at 72, 417 A.2d 505 (recognizing that "professional code of ethics may contain an expression of public policy" unless it "serve[s] only the interest of a profession"). Mobil criticizes the *128 Code of Ethics as too vague and charges that Mehlman did not act in a "responsible manner" because he had ordered a reduction in benzene levels without verifying the figures he claimed to have received from Tsunemori. Mehlman responds that he could not investigate them because Mobil had barred him from his work and his laboratory. We agree with Mehlman that his actions were responsible under the circumstances. He did not communicate any information outside of the company, intending to bring the matter to the attention of his superiors as soon as possible. There was no evidence that Mehlman was authorized to stop MSKK sales or that MSKK had ceased its gasoline sales in response to Mehlman's warning. We conclude that Mehlman "was not motivated by his personal values or conscience, but rather by his perception of his professional obligations." Kalman v. The Grand Union Co., 183 N.J. Super. 153, 157, 443 A.2d 728 (App.Div. 1982).
Mobil cites D'Agostino v. Johnson & Johnson, Inc., supra, 133 N.J. 516, 628 A.2d 305, to support its final contention that a clear mandate of public policy must have an intended extraterritorial effect. To advance its position, Mobil offers a hypothetical set forth in D'Agostino which illustrates the proposition that "forum policies are [often] not intended to have extraterritorial effect." Id. at 540, 628 A.2d 305. The Court posited:
For example, we might consider the hypothetical case of a researcher forbidden by federal law to conduct fetal research in the United States who, as an employee of a foreign subsidiary of a New Jersey company, is ordered to do fetal research in Canada. The employee would not have a retaliatory-discharge claim based on the forum law because, unlike the FCPA [Foreign Corrupt Practices Act], such a law would not seek to regulate conduct outside of the United States. A parent company in New Jersey that requires a Canadian employee of a subsidiary to do such research would not thereby violate a clear mandate of public policy.
[Id. at 540-541, 628 A.2d 305].
D'Agostino was a United States citizen employed in Switzerland by the Swiss subsidiary of a New Jersey corporation. Id. at 519-520, 628 A.2d 305. He had been terminated after refusing to authorize "consulting fees" to a member of a committee that advised the Swiss governmental agency regarding registration of *129 new drugs.[15]Id. at 520-521, 628 A.2d 305. In holding that New Jersey law governed D'Agostino's wrongful discharge claim, the Court identified the Foreign Corrupt Practices Act, 15 U.S.C.A. § 78dd-1 to -2, as a valid source of New Jersey public policy having an intended extraterritorial effect. Id. at 533-534, 628 A.2d 305. The Court found that "commercial bribery abroad ha[d] a potential effect on New Jersey and the health and welfare of its citizens" given the reality that the Swiss drug review boards affected documents used in the United States for the registration of drugs by the Food and Drug Administration as well as the registration of drugs in Switzerland. Id. at 532-533, 628 A.2d 305.
The Court cautioned that "[w]e do not suggest that the `whistle blower' act [CEPA] itself has an extraterritorial effect; rather it reflects our common-law employment law, which will apply extraterritorially only when the underlying clear mandate of public policy is intended to have an extraterritorial effect." Id. at 533-534, 628 A.2d 305. In rendering its decision, however, the Court was rejecting Johnson & Johnson's argument that "New Jersey ha[d] no cognizable interest in regulating Swiss employment relationships." Id. at 526, 628 A.2d 305. Because D'Agostino involved a Swiss resident employed by a Swiss company in Switzerland, the Court decided that it had to justify extending "the Pierce doctrine ... to a foreign resident employed in another country." Ibid.
Unlike D'Agostino, we are not confronted here with this situation because there has been no extension of CEPA to a foreign employment relationship in this case. Mehlman was not a Japanese employee working in Japan; he was a New Jersey citizen employed in New Jersey by a domestic company. As New Jersey law unquestionably applies here, CEPA has not been given extraterritorial application. Therefore, we need not decide whether our public policy has an intended extraterritorial effect through the *130 potential impact of Mobil's action on New Jersey and its citizens in order to justify Mehlman's invocation of CEPA protection. Even so, the public policy requiring warning labeling of gasoline with over 5% benzene, see 16 C.F.R. § 1500.14(b)(3)(i), had a direct corollary in the form of the Japanese Petroleum Association guideline and would have applied in any event through Mobil's "Policy On Product Safety Stewardship" in the absence of comparable Japanese governmental regulation.
Taken separately or collectively, the aforementioned proofs amply demonstrate that Mehlman identified a clear mandate of public policy which he reasonably believed that Mobil had violated when he objected in September 1989 to the distribution in Japan of gasoline with an excessive benzene content by Mobil subsidiary MSKK. The mandate was applicable in Japan through a professional association guideline as well as Mobil policy. The trial judge erred in finding to the contrary.

B.
Mobil contends that the dismissal of Mehlman's CEPA award was necessary to prevent a violation of the Commerce Clause through the improper regulation of foreign commerce. See U.S. Const. art I, § 8, cl. 3 ("The Congress shall have Power ... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes...."). Mobil alleges that the jury verdict results in "a New Jersey law, regulation or other `mandate' limiting benzene levels" in Japanese gasoline in a way that burdens a multinational corporation in the conduct of foreign commerce without promoting any legitimate state interest.
A CEPA award does not amount to the regulation of commerce. In the first place, our Supreme Court has established that a public policy mandate may support a wrongful discharge claim without governing conduct outside of that claim. See Hennessey v. Coastal Eagle Point Oil Co., supra, 129 N.J. at 98-99, 609 A.2d 11 (holding that New Jersey Constitution was one of several sources of "a clear mandate of public policy in privacy rights" supporting *131 wrongful discharge claim but "emphasiz[ing] that we are not finding in this opinion a constitutional right to privacy that governs the conduct of private actors"). Furthermore, if the Legislature had intended to prohibit an employer's conduct which gives rise to a CEPA claim, then there would have been no reason for it to have added the "clear mandate of public policy" provision in N.J.S.A. 34:19-3c(3). The statute would have simply provided that an employer may not retaliate against an employee for objecting to activity which the employee believes is in violation of a law, rule or regulation, or is fraudulent or criminal.
Moreover, state control over an employment relationship within its boundaries does not impose an impermissible burden upon foreign commerce. For example, the Supreme Court of the United States has rejected the argument that a state anti-discrimination law, when applied to an interstate air carrier, imposed an undue burden upon commerce in violation of the Commerce Clause. See The Colorado Anti-Discrimination Comm'n v. Continental Air Lines, Inc., 372 U.S. 714, 722, 83 S.Ct. 1022, 1026, 10 L.Ed.2d 84, 90 (1963). Interpreting federal precedent forbidding racial segregation in the treatment of passengers as mandating uniformity in the field, the Supreme Court of Colorado had invalidated the anti-discrimination law. 372 U.S. at 719, 83 S.Ct. at 1024, 10 L.Ed.2d at 88. In reversing that decision, the United States Supreme Court reasoned:
We are not convinced that commerce will be unduly burdened if Continental is required by Colorado to refrain from racial discrimination in its hiring of pilots in that State. Not only is the hiring within a State of an employee, even for an interstate job, a much more localized matter than the transporting of passengers from State to State but more significantly the threat of diverse and conflicting regulation of hiring practices is virtually nonexistent.
[372 U.S. at 721, 83 S.Ct. at 1025, 10 L.Ed.2d at 89 (footnote omitted)].
The Court also observed that discrimination against passengers on the basis of race was forbidden under the Fifth and Fourteenth Amendments. 372 U.S. at 722, 83 S.Ct. at 1026, 10 L.Ed.2d at 89-90.
Similarly, foreign commerce will not be impermissibly burdened if New Jersey requires Mobil to refrain from retaliatory discharge *132 of an intrastate employee for objecting to what he reasonably believed was a violation of public policy. The employment relationship within New Jersey is a "localized matter." Moreover, we note that Congress has established a national policy of protecting conscientious employees. See Whistleblower Protection Act of 1989, 5 U.S.C.A. § 1201.
In Instructional Sys., Inc. v. Computer Curriculum Corp., 130 N.J. 324, 328, 614 A.2d 124 (1992), the Court applied the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1 to -15, to the contractual relationship between an out-of-state producer of a computerized educational system and its New Jersey-based, exclusive regional distributor. The Court determined that the extraterritorial effect of the statute did not violate the Commerce Clause merely by "regulat[ing] in-state conduct that has out-of-state effects." Id. at 368, 614 A.2d 124. State regulation affecting interstate commerce is permissible so long as designed to further a legitimate state interest with no more than an incidental impact upon interstate commerce. Ibid. As the Court recognized,
[w]ere it otherwise, nearly every aspect of substantive state law would be disabled from affecting the conduct of multi-state corporations. When New Jersey law imposes a legal duty on the volitional behavior of a contracting party, that ruling will often have effects beyond state boundaries.
....
The proposition is "fairly well established that a state may regulate its residents, even when they are acting outside of the state." [Lea Brilmayer and Charles Norchi, Federal Extraterritoriality and Fifth Amendment Due Process, 105 Harv. L. Rev, 1217,] 1241 [(1992)] (discussing Skiriotes v. Florida, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941)). In Skiriotes, the State applied its law to one of its residents who, while outside the state's territorial waters, had violated environmental regulations. The Supreme Court upheld the State's action. Ibid.; Skiriotes, supra, 313 U.S. at 79, 61 S.Ct. at 930, 85 L.Ed. at 1201. A State's power over its own citizens should extend to protection of its own citizens' rights when dealing with others even though there may be incidental effects in other jurisdictions.
[Id. at 369-370, 614 A.2d 124].
That case has thus already decided favorably to Mehlman's position the question of whether New Jersey, through CEPA, may regulate the conduct of a multi-state corporation and may protect *133 its own citizens despite any incidental effect of such regulation on commerce with Japan.
The cases upon which Mobil relies involved state regulation which, unlike CEPA, unduly burdened or unfairly discriminated against interstate commerce either directly or in their effect.[16]
Moreover, Mobil has failed to show that Mehlman's CEPA award would either unfairly discriminate against or unduly burden foreign commerce. Even assuming that a CEPA award somehow resulted in burdening foreign commerce, we consider New Jersey's interest in protecting whistle-blowers to outweigh any such incidental effect. "Legislation is valid if it even-handedly regulates to advance legitimate local interests, notwithstanding incidental effects on interstate commerce, unless `the burden imposed on such commerce is clearly excessive to the putative local benefits.'" Crespo v. Stapf, 128 N.J. 351, 361, 608 A.2d 241 (1992) (quoting Pike v. Bruce Church, Inc., supra, 397 U.S. at 142, 90 S.Ct. at 847, 25 L.Ed.2d at 178). Any impact on foreign *134 commerce resulting from a CEPA award here would be remote and incidental. Mobil could still opt to produce and to sell gasoline in Japan containing excessive benzene levels despite the known adverse consequences, subject of course to the actions of Japanese officials. On the other hand, contrary to Mobil's argument, New Jersey has a legitimate and important interest in protecting employees in this state who protest their employers' improper activities, wherever those activities occur. This interest outweighs any incidental effect on foreign commerce.
We emphasize that a judgment for Mehlman under CEPA is by no means the equivalent of a requirement that Mobil must maintain any particular level of benzene in its Japanese gasoline. Instead, validation of Mehlman's CEPA claim signifies only that Mobil may not terminate Mehlman's New Jersey employment in retaliation for his protesting the level of benzene that Mobil permits in its Japanese gasoline. Mobil is free, within the bounds of Japanese regulation, to produce and to sell gasoline in Japan containing the benzene level of its choice. Our decision here simply upholds the jury's finding that Mobil's attempted discharge of Mehlman violated CEPA, which imposes no impermissible burden upon foreign commerce.
Mobil's final contention is that the jury's CEPA award to Mehlman unavoidably interferes with our nation's foreign policy. See Zschernig v. Miller, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683, reh'g denied, 390 U.S. 974, 88 S.Ct. 1018, 19 L.Ed.2d 1196 (1968). In Zschernig, an Oregon law had allowed a resident's estate to pass to a non-resident alien heir only if the alien had a right to receive it "without confiscation" and if United States citizens had a right to take property and receive payment of funds in this country from estates in the alien's country. 389 U.S. at 430-431, 88 S.Ct. at 665, 19 L.Ed.2d at 686. This was held to be State intrusion into foreign affairs. The Court discerned that "[t]he statute as construed seems to make unavoidable judicial criticism of nations established on a more authoritarian basis than our own." 389 U.S. at 440, 88 S.Ct. at 670, 19 L.Ed.2d at 692.
*135 By contrast, this case does not require our courts to evaluate either the Japanese form of government or the credibility of Japanese officials. Mehlman did not criticize the Japanese or their foreign policy attitudes. Rather, it may be asserted that he acted in the interests of the health, safety, and welfare of the Japanese people in objecting to what he believed, based on information given him, were the benzene levels in gasoline sold by Mobil's Japanese subsidiary.
The Zschernig Court did not prohibit our state courts from evaluating foreign laws in adjudicating CEPA claims:
State courts, of course, must frequently read, construe, and apply laws of foreign nations. It has never been seriously suggested that state courts are precluded from performing that function, albeit there is a remote possibility, that any holding may disturb a foreign nation  whether the matter involves commercial cases, tort cases, or some other type of controversy.
[389 U.S. at 433, 88 S.Ct. at 667, 19 L.Ed.2d at 688].
To the contrary, construction of the Japanese Petroleum Association guideline and the Japanese Environment Agency Notification was necessary to resolve this controversy. The possibility of disturbing the Japanese government is thus remote at best. Accordingly, we hold that Mehlman's CEPA award was neither repugnant to the Commerce Clause nor an intrusion into our nation's foreign policy-making.

III.
We now address Mobil's appeal. Mobil objects to the trial judge's amendment of the complaint to incorporate a claim of prima facie tort as well as to the award of punitive damages thereon. Mobil argues that the trial and the jury charge were based only on Mehlman's CEPA and contract claims; Mobil had neither notice nor opportunity to defend against the new claim; and, punitive damages cannot be awarded without an underlying cause of action, which it maintains was nonexistent. Mobil further contends that the punitive damages award violated its rights to procedural and substantive due process.
*136 In setting aside the jury verdict, the trial judge considered punitive damages to have been appropriate because Mobil's conduct had been "reprehensible under the circumstances." The judge cited two "whistle-blower" situations from recent news stories, in which the organization counter-attacked with a "smear campaign" against the employee. The judge observed that Mehlman had "clearly" and "overwhelmingly refuted" Mobil's charges of theft and "the attempt to orchestrate a smear campaign" against him. Although Mehlman attempts to buttress that decision by describing his "new" cause of action as related to malicious interference with a contractual agreement  the Japanese Petroleum Association's prohibition of the sale of gasoline with benzene levels in excess of 5%, the judge did not explain the elements of Mehlman's prima facie tort claim and how they applied to the facts.
Mehlman asserts that he did not know about the Japanese Petroleum Association agreement until Drummond testified about it.[17] By telling the truth, Mehlman maintains that he "unwittingly sought to enforce Mobil's obligations under the Agreement." According to Mehlman, Mobil "tortiously and maliciously interfered" with the agreement by terminating him and "brand[ing] him a thief in order to silence him or destroy his credibility." Mehlman acknowledges that "the traditional tort of malicious interference does not precisely fit this case," but argues in support of a prima facie tort theory that this intentional, malicious, and unjustified harm should be actionable.
*137 Mobil responds that the judge rejected this theory in favor of an "outrage" theory, but cites no place in the record where this occurred. Even though the judge's decision was based upon Mobil's "attempt to orchestrate a smear campaign" against Mehlman, the final judgment simply stated the complaint was amended "to include a claim under the doctrine of prima facie tort."
In support of a prima facie tort claim,[18] Mehlman relies upon Trautwein v. Harbourt, 40 N.J. Super. 247, 266, 123 A.2d 30 (App.Div.), certif. denied, 22 N.J. 220, 125 A.2d 233 (1956), where we rejected a cause of action for malicious exclusion from membership in a fraternal organization, but found "no difficulty with the theoretical concept, expressed in various ways by modern jurisprudence, that intentional, willful or malicious harms of any kind are actionable unless justified." Mehlman maintains that merely because his action does not fit into a well "defined or established `cubby-hole' of the law" should not deny him relief. Mobil counters that "New Jersey is an employment-at-will state," and that "[n]o New Jersey court has ever recognized the doctrine of prima facie tort in a wrongful termination case."
Even if the judge was correct in allowing amendment of the complaint to allow Mehlman to assert a cause of action for prima facie tort, Mobil correctly argues that the CEPA waiver provision, N.J.S.A. 34:19-8, precludes this claim.[19]N.J.S.A. 34:19-8 provides:
Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or under any collective bargaining agreement or employment contract; except that *138 the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law.
In Young v. Schering Corp., 141 N.J. 16, 660 A.2d 1153 (1995),[20] the Court interpreted this waiver provision as follows:
A literal reading of the statute should not be invoked because we are thoroughly convinced the Legislature did not intend to penalize former employees by forcing them to choose between a CEPA claim and other legitimate claims that are substantially, if not totally, independent of the retaliatory discharge claim.
One purpose of CEPA is to make it easier, not harder, for a former employee to prevail on a retaliatory discharge claim....
[Id. at 25-26, 660 A.2d 1153 (citations omitted)].
Recognizing that the purpose of the waiver provision is to prevent "multiple or duplicative claims based on retaliatory discharge," the Court held that
once a CEPA claim is "instituted," any rights or claims for retaliatory discharge based on a contract of employment; collective bargaining agreement; State law, whether its origin is the Legislature, the courts, the common law or rules of court; or regulations or decisions based on statutory authority, are all waived.
* * * * * * * *
[T]he waiver provision applies only to those causes of action that require a finding of retaliatory conduct that is actionable under CEPA. The waiver exception does not apply to those causes of action that are substantially independent of the CEPA claim.
[Id. at 29, 660 A.2d 1153].
The Young Court concluded that the plaintiff's claims of defamation, slander, and malicious interference with prospective employment opportunities were not waived because they "require[d] different proofs than those required to sustain the CEPA claim and [did] not require a showing of retaliation as does a CEPA claim." Id. at 32, 660 A.2d 1153 (quoting 275 N.J. Super. at 239, 645 A.2d 1238). By contrast, there is a direct evidential relationship between Mobil's discharge of Mehlman in an effort to interfere *139 with his enforcement of the Japanese Petroleum Association agreement (prima facie tort claim) and Mobil's termination of Mehlman due to his objection to the company's wrongdoing (CEPA claim). Although not identical in every respect, the proofs of these claims basically consist of Mobil's discharge of Mehlman for objecting to the sale of gasoline in Japan with a benzene content of over 5%. The only difference between these causes of action is the absence of a clear mandate of public policy in the prima facie tort claim. The finding of retaliatory conduct remains essential in both. The prima facie tort claim is simply a claim for retaliatory discharge based upon the common law, thereby avoiding the CEPA requirement of a clear mandate of public policy. Mehlman's institution of his CEPA action thus waived his prima facie tort claim. See id. at 29, 660 A.2d 1153. N.J.S.A. 34:19-8 requires no more than the institution of the CEPA action to constitute a waiver of any tort claim.
In view of our conclusion that Mehlman must be deemed to have waived a prima facie tort type claim, we need not address Mobil's assertion that the post-verdict amendment of the complaint deprived it of notice and an opportunity to defend against the prima facie tort claim. R. Wilson Plumbing & Heating, Inc. v. Wademan, 246 N.J. Super. 615, 616-617, 588 A.2d 444 (App.Div. 1991).[21]
Mobil argues as well that the award of punitive damages was improper without an underlying cause of action. Mehlman *140 concedes that Mobil's argument "has some merit," but maintains that he is entitled to "complete relief, compensatory and punitive damages." Mobil counters that this would "compound" the error. We explained in Stella v. Dean Witter Reynolds, Inc., 241 N.J. Super. 55, 70, 574 A.2d 468 (App.Div.), certif. denied, 122 N.J. 418-419, 585 A.2d 412 (1990), however, that compensatory damages are not necessary for an award of punitive damages so long as the plaintiff has suffered "some harm" as a result of the defendant's conduct. Mehlman was obviously severely harmed by Mobil's conduct inasmuch as the loss of his job resulted in a substantial reduction in his income and his ensuing emotional distress.
Mobil's final contention is that the punitive damages award of $3,500,000 was both unjustified and excessive in violation of due process. See U.S. Const. amend. XIV. Mobil relies upon TXO Prod. Corp. v. Alliance Resources Corp., 509 U.S. 443, 451-453, 113 S.Ct. 2711, 2717, 125 L.Ed.2d 366, 372 (1993), which affirmed awards of $19,000 in actual damages and $10,000,000 in punitive damages for slander of title. The Court determined that the award was not so "grossly excessive" as to violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution despite "the dramatic disparity between the actual damages and the punitive award...." 509 U.S. at 462, 113 S.Ct. at 2722-2723, 125 L.Ed.2d at 382. Assuming that "fair procedures were followed" during the jury trial, the Court concluded that "a judgment that is a product of that process is entitled to a strong presumption of validity." 509 U.S. at 457, 113 S.Ct. at 2720, 125 L.Ed.2d at 378. The Court explained that
[i]t is appropriate to consider the magnitude of the potential harm that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred.
[509 U.S. at 460, 113 S.Ct. at 2721-2722, 125 L.Ed.2d at 381].
The evidence was undisputed that benzene levels of over 5% were poisonous and that "many people would die from this ... unnecessary overexposure...." The potential harm to other victims here would have been profound given the number of *141 people Mehlman was trying to protect from benzene poisoning, assuming Mobil exceeded the levels. Furthermore, Mobil admits that "the trial court merely transferred the sum of $3,500,000 from the jury's award" and does not challenge as procedurally deficient in any way the trial that resulted in this award. Therefore, the award deserves the strong presumption of validity established in TXO Prod. Corp. v. Alliance Resources Corp., supra, 509 U.S. at 456-458, 113 S.Ct. at 2720, 125 L.Ed.2d at 378, and strikes us as neither improper nor excessive. To the contrary, the jury's $3.5 million punitive damage award is a necessary deterrent to prevent Mobil and other companies from silencing their employees when they object to the type of harmful, dangerous conduct by their employers claimed here. This case does not present the type of punitive damages situation brought into question in the recent case of BMW of N. Am., Inc. v. Gore, ___ U.S. ___, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).
In sum, whether or not Mobil had an opportunity to defend against the claim of prima facie tort, Mehlman waived any such claim based upon his retaliatory discharge when he instituted his CEPA claim. The trial judge thus erred in adding this claim post-trial. In light of the serious harm inflicted by Mobil on Mehlman, we nevertheless affirm the jury's punitive damage award under the CEPA claim.

IV.
Finally, Mehlman objects to the dismissal of his defamation claim. In count VI of his amended complaint, Mehlman had alleged that Mobil, "through its agents, officers and employees, disseminated to Mehlman's personal, professional and business peers that [he] was terminated" for just cause and "due to some inappropriate action...." The trial judge dismissed this count as waived under N.J.S.A. 34:19-8 because it was a "common law cause[] of action...."
Mobil's false and defamatory publications are claimed to have caused people to conclude "that plaintiff was in fact guilty of *142 maintaining conflicting interest, disloyalty, dishonesty, and other demeaning characterizations." Mobil purportedly made these statements maliciously with the intent to injure Mehlman. They have assertedly injured Mehlman, personally and professionally, causing him financial loss, "public contempt, disgrace, scorn, prejudice and ridicule, ... grave impairment of his good name," loss of "esteem and respect," "great pain," and "mental anguish."
Mobil argues that we "could tell from the face of the complaint" that Mehlman's defamation claim resembles his CEPA claim. We disagree. The defamation claim in Young was basically the same as the one before us here: Mehlman claimed that his supervisor "defamed and slandered his personal and professional reputation by `gratuitously broadcasting'" to the professional community, including Mobil's employees, that Mehlman had been terminated for wrongdoing. Young v. Schering Corp., supra, 275 N.J. Super. at 226, 645 A.2d 1238. Mobil submits that Mehlman should have amended his complaint to show that his defamation claim "rested on facts that fell outside his CEPA claim." As we have discussed, however, any defamation claim requires different proofs than those required for a CEPA claim. Id. at 239, 645 A.2d 1238. On appeal, the Supreme Court confirmed that the plaintiff in Young did not waive his defamation claim by instituting his CEPA claim. See Young v. Schering Corp., supra, 141 N.J. at 31-32, 660 A.2d 1153. The Court observed that retaliation for disagreeing with the employer's decision was not an element of defamation, and that even if plaintiff could prove defamation, "`such conduct will not constitute a violation of CEPA.'" Id. (quoting 275 N.J. Super. at 240, 645 A.2d 1238).
Noting that the amended complaint incorporates his CEPA claim into his defamation claim, Mobil asserts that the two claims were "directly relate[d]." In Mobil's view, "the alleged dissemination of the reasons for terminating Mehlman appear in the complaint to have been part and parcel of the Company's alleged `retaliation' against him." This is not totally correct. The dissemination of the reasons for Mehlman's termination was made "to *143 plaintiff's personal, professional and business peers," which included people outside of Mobil. Otherwise, Mehlman could not be subject to public ridicule, contempt, disgrace, scorn and prejudice, and the loss of his good name. Retaliation, on the other hand, need not involve the public or anyone outside the company.
Although some of the damages sought in a defamation action may be common to the CEPA action, Mehlman has the burden of showing different and distinct damages so as to avoid a double recovery if the reinstated defamation action is pursued.

V.
In summary, Mehlman did identify a clear mandate of public policy. A Consumer Product Safety Commission regulation required products with more than 5% benzene to be labeled "danger" and "poison" with a skull and crossbones symbol. Although this regulation did not apply in Japan, a trade organization there had a guideline setting the benzene level of gasoline at a maximum of 5%. The technical manager for Mobil's Japanese subsidiary essentially conceded that his company was bound to follow that guideline. While Mehlman was unaware of this guideline when he made his objection, he nonetheless reasonably believed that Japanese regulations paralleled those promulgated by our federal government. In addition, Mobil's policy called for application of health standards of developed countries in the absence of local regulation. Mehlman was also concerned about product liability, professional negligence, and professional ethics when he made his objection. Mobil's attempt to defeat the application of CEPA to this New Jersey employment relationship based upon a proffered violation of the Commerce Clause is unpersuasive. Mehlman's CEPA claim neither burdens nor discriminates against foreign commerce, and in any event, even its potential impact upon foreign commerce is at most incidental. That claim is readily distinguishable from Mehlman's defamation claim. Accordingly, the trial judge erred in dismissing Mehlman's defamation claim.
*144 The jury verdict and damages award on the CEPA claim are reinstated. The judgment on the prima facie tort claim is vacated. The dismissal of the defamation claim is reversed. The defamation claim is remanded to the Law Division for trial.
NOTES
[1] Mobil alleged that Mehlman had ignored its advice to discontinue his ownership interest. By transferring it to his wife's company, Mobil claimed he diverted its assets to that enterprise. This claim was dismissed and is not the subject of this appeal.
[2] McCullough reported to Joseph D'Ambrisi, Mobil Vice President of Research and Engineering and MRDC President. Upon McCullough's retirement in May 1989, Anthony Silvestri replaced him.
[3] For example, Mehlman earned his last merit raise on September 16, 1989, which increased his monthly salary from $12,125 to $12,800. Mobil rewarded his work with an annual December cash bonus, which totalled $30,000 in his last year of employment.
[4] Tsunemori represented that the benzene levels of gasoline from the other two refineries supplying MSKK were under 3% in the summer of 1989. Drummond had represented that MSKK had at most 7% of the market share of regular gasoline in Japan in 1989.
[5] No data was presented for the month of September 1988.
[6] Mehlman claimed to have been aware of the Treaty of Friendship, Commerce and Navigation, Apr. 2, 1953, U.S.  Japan, 4 U.S.T. 2063, which he understood to prohibit Japanese companies from selling products that would poison American citizens and American companies from selling products that would poison Japanese citizens. The treaty allows nationals of each signatory into the territory of the other for trade and business purposes "subject to the right of either Party to apply measures that are necessary to ... protect the public health, morals and safety." Id. at 2066.
[7] The regulation set .01 milligrams per liter as the permissible level of benzene in public water, which Mehlman considered to be an "extremely low level[] of benzene."
[8] In July 1987, McCullough had advised D'Ambrisi of his interest in publishing Mobil papers in peer review journals and mentioned Mehlman as "able to help expedite the process through his contacts with key editors." McCullough admitted that Mehlman's publishing helped him represent Mobil's interests. Silvestri conceded that Mobil was proud that Mehlman was "a highly published scientist." As an example of how his publishing had helped Mobil, Mehlman described how the company had paid only for the mailing costs, but received credit for a donation of over $125,000 of Mehlman's books and journals to a medical school library in Armenia following an earthquake there.
[9] N.J.S.A. 34:19-3 provides:

An employer shall not take any retaliatory action against an employee because the employee does any of the following:
....
c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
(1) is in violation of a law, or a rule or regulation promulgated pursuant to law;
(2) is fraudulent or criminal; or
(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.
The Legislature incorporated the phrase "or protection of the environment" by amendment after Mehlman's termination. See L. 1989, c. 220, § 1 (effective December 29, 1989).
[10] Both parties agree that the trial judge must "identify the mandate of public policy in [a CEPA] case as a question of law...." Fineman v. New Jersey Dep't of Human Servs., 272 N.J. Super. 606, 619, 640 A.2d 1161 (App.Div.), certif. denied, 138 N.J. 267, 649 A.2d 1287 (1994).
[11] In contrast to N.J.S.A. 34:19-3c, which imposes no such requirement, other statutes do require "actual knowledge." See, e.g., N.J.S.A. 2A:44A-7 (disbursement of funds without actual knowledge of filing of lien claim under Construction Lien Law constitutes prima facie evidence of material prejudice by party proving lack of timely service of lien claim) (effective April 22, 1994); N.J.S.A. 46:2E-6c (instrument disclaiming interest in inter vivos transfer may be filed by one who lacks actual knowledge of intent within nine months after such knowledge is obtained subject to limitations) (effective February 28, 1980); N.J.S.A. 59:4-3a (public entity held to have actual notice of dangerous condition under Tort Claims Act provided that entity had actual knowledge of its existence and knew or should have known of its dangerous nature) (effective July 1, 1972).
[12] Mobil claims that CEPA is "harmonious with" and an implementation of Pierce. Fineman v. New Jersey Dep't of Human Servs., supra, 272 N.J. Super. at 617, 623, 640 A.2d 1161. We appreciate that the Supreme Court has recently described CEPA as a codification of Pierce. See Barratt v. Cushman & Wakefield of N.J., Inc., 144 N.J. 120, 126-127, 675 A.2d 1094 (1996). In Young v. Schering Corp., supra, 141 N.J. at 26, 660 A.2d 1153, however, the Court indicated that CEPA is only "a partial codification of the prior common-law prohibition against the retaliatory discharge of at-will employees," which Pierce had "principally articulated." For example, whereas Pierce required that the discharge must be "contrary to a clear mandate of public policy," 84 N.J. at 72, 417 A.2d 505, CEPA mandates only that the employee reasonably believe that a violation of public policy has occurred, N.J.S.A. 34:19-3a and 34:19-3c. Furthermore, although "internal expressions of disagreement with corporate policy" are insufficient to establish a claim of wrongful discharge under Pierce, House v. Carter-Wallace, Inc., 232 N.J. Super. 42, 51, 556 A.2d 353 (App.Div.), certif. denied, 117 N.J. 154, 564 A.2d 874 (1989), an employee need not communicate his belief to anyone outside of his company under either N.J.S.A. 34:19-3a or 34:19-3c.
[13] Without belaboring the point, we refrain from considering such arguments raised by Mehlman as whether the sale in Japan of gasoline containing excessive levels of benzene violated New Jersey public policy respecting the expansion of international trade with Japan, see N.J.S.A. 52:27H-22.1a, or the prompt reporting and remediation of hazardous discharges on industrial sites, see N.J.S.A. 13:1K-16.
[14] The Code of Ethics provides that "I, as a member of the Society of Toxicology, shall ... [s]eek to communicate information concerning health, safety, and toxicity in a timely and responsible manner, with due regard for the significance and credibility of the available data."
[15] The termination of D'Agostino occurred prior to the enactment of CEPA. D'Agostino v. Johnson & Johnson, Inc., supra, 133 N.J. at 527, 628 A.2d 305.
[16] In C & A Carbone, Inc. v. Town of Clarkstown, N.Y., 511 U.S. 383, ___, 114 S.Ct. 1677, 1680, 128 L.Ed.2d 399, 405 (1994), for instance, the Court invalidated a municipal "flow control" ordinance designed to finance a transfer station, as discriminating against other processors. 511 U.S. at ___, 114 S.Ct. at 1683, 128 L.Ed.2d at 408. Other state statutes have suffered a comparable fate because they impermissibly burdened interstate commerce. See, e.g., Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573, 583-584, 106 S.Ct. 2080, 2086-2087, 90 L.Ed.2d 552, 562-563 (1986) (striking down New York statute requiring liquor distillers to affirm that their charges to New York wholesalers would be no more than lowest price charged elsewhere in nation due to law's "practical effect" of controlling liquor prices in other states); Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 671, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580, 587 (1981) (Iowa statute limiting size of trucks travelling on state highways unconstitutionally burdened interstate commerce); Hughes v. Oklahoma, 441 U.S. 322, 338, 99 S.Ct. 1727, 1737, 60 L.Ed.2d 250, 263 (1979) (overturning Oklahoma statute prohibiting interstate transportation or shipment for sale of intrastate minnows as repugnant to Commerce Clause); Pike v. Bruce Church, Inc., 397 U.S. 137, 146, 90 S.Ct. 844, 849, 25 L.Ed.2d 174, 181 (1970) (Arizona statute discriminated against out-of-state packers by requiring all cantaloupes grown in state and offered for sale to be packed in state-approved containers identifying Arizona as place of origin; it possessed minimal justification in light of burden on interstate commerce).
[17] During argument on Mobil's motion for summary judgment on the CEPA claim, defense counsel represented that "[t]he Japanese government, in 1991, issued a guideline restricting the sale of gasoline with a benz[e]ne content in excess of five percent," but that "[i]n September of 1989, there [was] no guideline in Japan."

Drummond testified at trial for Mobil that MSKK had followed an industry association guideline, which apparently had not yet been promulgated by the Japanese government. Nevertheless, Tsunemori essentially confirmed that no Association member would knowingly disobey the 5% standard.
[18] The Trautwein court referred to the term "prima facie tort" in a citation to an article, Note, The Prima Facie Tort Doctrine, 52 Col. L.Rev. 503 (1952). See 40 N.J. Super. at 266, 123 A.2d 30. Our research discloses that only once since then has the term been employed by our courts. See 2175 Lemoine Ave. Corp. v. Finco., Inc., 272 N.J. Super. 478, 481 n. 1, 483, 640 A.2d 346 (App.Div. 1994) (appeal of dismissal of action sounding in prima facie tort withdrawn).
[19] Although at argument on the post-trial motions the trial judge questioned whether CEPA "preempted" a claim for prima facie tort, he did not decide the issue.
[20] The parties reference our opinion in Young v. Schering Corp., 275 N.J. Super. 221, 645 A.2d 1238 (App.Div. 1994). In affirming our decision, the Supreme Court adopted a portion of our opinion in its July 11, 1995 opinion. See 141 N.J. at 31-32, 660 A.2d 1153 (quoting 275 N.J. Super. at 239-240, 645 A.2d 1238).
[21] In Wilson, we acknowledged that "the proofs might have supported [the] consumer fraud cause of action" that the trial judge had raised sua sponte in his decision on the plaintiff's claim for payment for plumbing repairs. As a matter of procedural due process, we explained that R. 4:9-2

does not, however, permit the trial court to enter judgment against a party on a cause of action which is conceived of by the judge only after submission of the case to him for decision, which comes as a complete surprise to all the litigants, and whose post-trial interjection in the case obviously prejudices the litigant who is accorded no opportunity to offer a factual or legal defense.
[Id. at 617, 588 A.2d 444].