686 A.2d 1212

KATHLEEN FALCO AND JOSEPH FALCO, PLAINTIFFS–APPELLANTS, v. COMMUNITY MEDICAL CENTER, PHILLIP BARRECA,[1] DR. MICHAEL BAGEAC, JOHN MARKEL,[2] JAN CROSBY, AND DR. JAMES PASQUARIELLO, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued September 25, 1996—Decided January 13, 1997.

---

[1] Defendant Philip Barreca's first name was improperly spelled "Phillip" in plaintiff's complaint.

[2] Defendant John Markle was improperly identified in plaintiff's complaint as "John Markel."

300

Before Judges MUIR, Jr., KLEINER, and COBURN.

*Linda B. Kenney* argued the cause for appellants.

*Kathleen M. Connelly* argued the cause for defendants-respondents Community Medical Center, John Markle, and Jan Crosby (*Genova, Burns, Trimboli & Vernoia*, attorneys; *Ms. Connelly*, on the joint brief).

*John H. Schmidt, Jr.*, argued the cause for defendant-respondent Philip Barreca (*Lindabury, McCormick & Estabrook*, attorneys; *Mr. Schmidt*, on the joint brief).

*Keith A. Krauss* argued the cause for defendant-respondent Dr. James Pasquariello (*Connell, Foley & Geiser*, attorneys; *Mr. Krauss*, on the joint brief).

*Kenneth I. Nowak* argued the cause for defendant-respondent Dr. Michael Bageac (*Zazzali, Zazzali, Fagella & Nowak*, attorneys; *Mr. Nowak*, on the brief).

The opinion of the court was delivered by

KLEINER, J.A.D.

Plaintiffs Kathleen Falco and Joseph Falco appeal from the dismissal of their complaint. Plaintiffs were seeking damages based on Kathleen Falco's termination as a nurse in the Cardiac Catheterization Laboratory of defendant Community Medical Center.[3]

Kathleen Falco, a registered nurse, was hired by defendant Community Medical Center, located in Toms River, on October 4, 1989. She was assigned to the Cardiac Catheterization Lab on September 4, 1991. Plaintiff's employment was terminated on September 18, 1992.

Plaintiff's complaint, filed on March 30, 1993, alleged that her employment was terminated in retaliation for "whistleblowing activities," in violation of the Conscientious Employee Protection

---

[3] All references to "plaintiff" hereinafter specifically refer to Kathleen Falco. All references to Joseph Falco's *per quod* claim shall be separately designated.

Act (CEPA), *N.J.S.A.* 34:19–1 to –8, (count one). The remaining counts of plaintiff's complaint asserted: a common law claim of retaliatory discharge and intentional infliction of emotional distress (count two); a constitutional tort (count three); negligent infliction of emotional distress (count six); intentional infliction of emotional distress (count seven); a discharge in violation of public policy (count eight); and Joseph Falco's *per quod* claim (count nine). In counts four and five, plaintiff alleged that her termination violated her contractual rights.

Pursuant to a motion to dismiss filed by all defendants, the motion judge dismissed counts two, three, six, seven, and eight. The judge concluded that each of those claims was barred under the CEPA waiver provision as set out in *N.J.S.A.* 34:19–8. The motion judge also dismissed count nine, Joseph Falco's *per quod* claim, relying on our decision in *Catalane v. Gilian Instrument Corp.,* 271 *N.J.Super.* 476, 493, 638 *A.*2d 1341 (App.Div.), *certif. denied,* 136 *N.J.* 298, 642 *A.*2d 1006 (1994).

The only counts then remaining were count one, the CEPA claim, and counts four and five, alleging breach of contract. Thereafter, on a motion for summary judgment filed by all defendants except Dr. Michael Bageac, those counts were dismissed. Plaintiff then filed a motion to amend her complaint to assert a claim for tortious interference with a contractual relationship and prospective economic advantage. In a separate ruling, the motion judge denied plaintiff's motion.

On appeal, plaintiff challenges each of the pre-trial rulings. After our careful review of the record and our analysis of precedent, we conclude that the motion judge properly dismissed each count of plaintiff's complaint, either procedurally or summarily, and did not abuse her discretion in refusing to grant plaintiff leave to file an amended complaint.

Each of the motion judge's rulings requires some discussion with the exception of the dismissal of count nine, Joseph Falco's *per quod* claim. *R.* 2:11–3(e)(1)(E). We affirm.

## I

The factual background surrounding plaintiff's employment history is somewhat complex. The crux of plaintiff's complaint is that defendants' reasons for plaintiff's termination were pretextual. Defendants contend that the events of August 27, 1992, involving a particular cardiac catheterization procedure and the resulting investigation of those events, gave them a justifiable reason to terminate plaintiff's employment.

Plaintiff contends that she was terminated in retaliation for complaints that she voiced about her direct supervisor, defendant Phillip Barreca. We are therefore compelled to review the events surrounding plaintiff's termination.

### A.

Defendant Community Medical Center (CMC) is administratively compartmentalized. Defendant Jan Crosby was the administrative director of Cardio–Neuro Services. Part of the Cardio–Neuro Services is the hospital's Cardiac Catheterization Laboratory (Cath Lab), managed by defendant Phillip Barreca. Five employees were assigned to that unit during plaintiff's tenure: two cardiovascular technicians, Helen Clanton and Lorraine Camper; a radiology technician, Michael Siemers; and two registered nurses, Barbara Lechner and plaintiff. Vince Joseph is the executive vice president and chief operating officer of CMC. John Markle is the vice president of human resources.

Cardiologists with privileges at CMC perform cardiac catheterizations at the Cath Lab. These cardiologists include defendants Dr. Pasquariello and Dr. Bageac. Although Dr. Pasquariello serves as the medical director of the Cath Lab, neither he, nor Bageac, are employees of CMC, and neither had authority to hire, fire, or otherwise discipline hospital employees.

### B.

On August 27, 1992, plaintiff is alleged to have performed a solo

Quinton[4] recording during a right and left catheterization performed by Dr. Bageac. As Dr. Bageac described it, "[o]n this occasion, the patient was undergoing a diagnostic procedure performed on an urgent basis because an immediate diagnosis of the patient's cardiac condition was necessary." Dr. Bageac certified:

[B]ased upon my initial observations and calculations of the patient's cardiac condition, I made an initial recommendation that the patient immediately undergo open heart surgery, which required that the patient immediately be transferred to another hospital which had the appropriate facilities for that operation. However, I noted that the hemodynamic flow sheet [i.e., Quinton report] prepared by [plaintiff] contained numerous calculation errors, resulting in physiological data that did not comport with my initial observations and calculations. I also noticed that [plaintiff] did not prepare the final computer report that day. As [plaintiff] had left work by that time, I had to wait until first thing in the morning on the next day to tell her.

The next morning I brought these errors to [plaintiff's] attention. I requested that she immediately prepare a corrected flow sheet and final report because the

---

[4] The Quinton is a machine used during a catheterization procedure to monitor and record a patient's internal cardiac pressures as well as certain valve openings. During a catheterization of the left chamber of a patient's heart, the Quinton monitors the left ventricle pressure, aortic pressure, and, on rare occasions, femoral artery pressure. The Quinton records the pressures when the operator of the machine presses a button corresponding to the particular pressure to be recorded. The operator can generate a final report by pressing another button at the end of the procedure. The operator is responsible for performing manual calculations and for verifying the machine's calculations after generating the final report. Approximately seventy or eighty percent of the catheterizations performed in the Cath Lab are left heart catheterizations.

Operation of the Quinton is more difficult if a right and left heart catheterization is being performed. There are more heart pressures that need to be monitored and recorded during such a procedure. During a right and left heart catheterization, the Quinton may, depending on the patient, monitor and record pressures in the interior vena cava, the right atrium, a high right atrium, the mid right atrium, the right ventricle, the pulmonary artery, the pulmonary wedge, the aorta, and the left ventricle. Like a left heart catheterization, a right and left heart catheterization requires the Quinton operator to perform manual calculations and to verify the machine's calculations by hand. Although a left heart catheterization takes only twenty-five minutes to complete, a full right and left heart catheterization may take anywhere from an hour to four or five hours, depending on the diagnosis.

The final report generated by the Quinton contains all of the physiological data recorded during the catheterization and is relied upon by the cardiologist when deciding whether the patient should submit to heart surgery.

patient was being transferred to Hackensack Medical Center, for emergency coronary and valvula surgery, at noon of that day, but [plaintiff] indicated that she could not correct the errors immediately. She stated that she could not generate a corrected report until all of the cardiac catheterizations scheduled for that day were completed. I attempted to correct the errors on the flow sheet by performing the essential calculations by hand.

As a result, Dr. Bageac had to transfer his patient to another hospital with an initial recommendation that the patient immediately undergo cardiac surgery, although he "was unable to transport the computer generated physiological data to support that initial recommendation."

Dr. Bageac also certified that plaintiff did not disclose that she was unauthorized to operate the Quinton during a right and left catheterization. Dr. Bageac reported the incident to Barreca, who certified that plaintiff had never been authorized to operate the Quinton during a right and left heart catheterization. Barreca declared:

Although fully trained to operate the Quinton computer during left heart catheterization procedures, she had not been fully trained and was never told (explicitly nor implicitly) that she could operate that computer during left and right heart catheterization procedures. In fact, before I left the Medical Center for a one week vacation in August, 1992, I left specific directions with the laboratory staff that only Barbara Lechner was to operate the Quinton computer during any left and right heart catheterization procedures while I was on vacation.

On September 17, 1992, plaintiff attended a meeting with Barreca, Crosby, and Markle. The agenda for that meeting included three items pertinent to plaintiff's employment performance: (1) plaintiff's alleged unauthorized operation of the Quinton; (2) an alleged breach of patient confidentiality; and (3) an allegation that plaintiff had made a disparaging remark about Dr. Bageac to other hospital personnel. At the meeting, according to plaintiff, it was disclosed that Dr. Bageac had threatened the hospital with legal action unless it terminated plaintiff's employment.

Plaintiff testified in a discovery deposition that at the September 17, 1992, meeting the three items on the agenda were discussed. According to plaintiff, "I was told by John Markle that I was a menace to the hospital and I was no longer wanted to work there." Plaintiff claims she was given the option of resigning or

being terminated. The following morning plaintiff arrived and handed Crosby a typed letter refusing resignation. Plaintiff was immediately terminated.

## II

Plaintiff's complaint, filed March 30, 1993, challenged her discharge, contending that her termination was retaliatory. Her complaint asserts that her discharge was a violation of the New Jersey Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8.

Plaintiff's claim of retaliation focuses on two of her activities as an employee: (a) plaintiff's affiliation with one of two cardiologist factions vying to have one of their members named department chief at CMC; and (b) the fact that she voiced concerns about the "management style" of her direct supervisor, defendant Barreca.

On April 21, 1992, during an informal discussion, laboratory employees discussed varied complaints about Barreca's management techniques. The employees concluded that they, as a group, would voice these complaints to Kathy Collins, vice president of administration at CMC, on May 14, 1992, at a meeting that was specifically scheduled for that purpose. Plaintiff would later testify that sixteen complaints were discussed at that meeting and that she and the other staff members were promised that no retaliatory action would be taken against any employee for expressing concerns.

In her deposition testimony, plaintiff acknowledged that after Collins told Barreca about the employees' complaints, Barreca's management style improved. Plaintiff also admitted that, with the exception of her termination, she was not targeted for retaliation by Barreca during the remainder of her employment at CMC.

In response to defendant's motion for summary judgment, plaintiff focused on three specific complaints that were made about Barreca's management style in an attempt to demonstrate that her termination was a direct retaliatory response to plaintiff's

activities. The three complaints were that: (a) Barreca had administered nitroglycerin to patients, in compliance with doctors' orders, yet, allegedly, contrary to the Nurse Practice Act, *N.J.S.A.* 45:11-23 to -44; (b) Barreca directed plaintiff to stop administering protamine [5] to a patient, after she had administered ten milligrams, which contradicted a physician's order, directing plaintiff to administer fifteen milligrams; and (c) Barreca interfered with plaintiff's nursing judgment when he instructed plaintiff that patients experiencing an irregular heart rhythm, ventricular fibrillation, should not be "shocked" at anything less than 360 joules, contrary to a standard set forth in an Advanced Cardiac Life Support Protocol.

## III

The motion judge granted defendants' motion for summary judgment on the CEPA count for two reasons: (1) plaintiff failed to identify any statute or clear mandate of public policy that she reasonably believed had been violated at her place of employment; and (2) plaintiff failed to proffer any evidence of a causal nexus between her purported whistleblowing activity and her termination. Based upon *Brill v. Guardian Life Insurance Co. of America*, 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995), the motion was properly granted. The pleadings, certifications, and extensive deposition testimony offered in support of defendants' motion demonstrated that there were no genuine issues of material fact.

The mere fact that plaintiff, in her certification, denied committing the acts that constituted defendant's reasons for plaintiff's termination does not raise a genuine issue of material fact. The dispositive issue is whether defendants had a good faith belief that plaintiff committed these acts and considered those acts in reaching their decision to terminate plaintiff. In other words, were the

---

[5] Protamine is a blood-thickening agent that must be administered slowly because excessive dosages can precipitate heart attacks.

three acts that were attributed to plaintiff a legitimate rational basis to terminate her employment?

■ CEPA was enacted to protect employees from retaliatory discharge. *See Young v. Schering Corp.,* 141 *N.J.* 16, 26, 660 *A.*2d 1153 (1995); *Flaherty v. The Enclave,* 255 *N.J.Super.* 407, 412, 605 *A.*2d 301 (Law Div.1992). CEPA represents a codification of the common law rule announced in *Pierce v. Ortho Pharmaceutical Corp.,* 84 *N.J.* 58, 417 *A.*2d 505 (1980), that an employee at-will may have a cause of action for wrongful discharge in violation of a clear mandate of public policy. *Potter v. Village Bank of New Jersey,* 225 *N.J.Super.* 547, 560, 543 *A.*2d 80 (App.Div.), *certif. denied,* 113 *N.J.* 352, 550 *A.*2d 462 (1988). Towards that end, CEPA provides, in part:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law;
>
> ....
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law;
>
> (2) is fraudulent or criminal; or
>
> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare.... .
>
> [*N.J.S.A.* 34:19–3.]

We have concluded that a court examining a CEPA claim "must first find and enunciate the specific terms of a statute or regulation, or the clear expression of public policy, which would be violated if the facts as alleged are true." *Fineman v. New Jersey Department of Human Services,* 272 *N.J.Super.* 606, 620, 640 *A.*2d 1161 (App.Div.), *certif. denied,* 138 *N.J.* 267, 649 *A.*2d 1287 (1994). Such a finding is a finding of law. *Ibid.*

At argument on defendants' motion for summary judgment, plaintiff contended that Barreca had violated the Nurse Practice Act, as well as a public policy aimed at protecting patients. In her

brief in opposition to defendants' motion, plaintiff also alleged that Barreca violated *N.J.A.C.* 13:37–1 and *N.J.A.C.* 8:65–7.7. Plaintiff argued that Barreca violated the Act and related Administrative Code provisions by administering nitroglycerin to a patient without a license. It should be noted that Barreca certified that he had never given nitroglycerin to a patient. Whether Barreca ever administered the drug is of no concern, as we can find no clear mandate of public policy that would prevent Mr. Barreca from so doing.

Plaintiff also argued that Barreca violated public policy by "interfering in [plaintiff's] judgment in shocking patients and interfering with her judgment in giving IVs to patients and Barreca's interference with whether EKG reports should be affixed to records." Lastly, plaintiff argued that Barreca violated the Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1, by giving preferential treatment to Mike Siemers, the only male employee of the Cath Lab.

In her brief in opposition to defendants' motion as well as at oral argument, plaintiff failed to specify any particular provision of the above laws and codes that Barreca violated. Plaintiff's brief on appeal and her oral argument on this appeal suffer from the same insufficiency. Plaintiff simply fails to comply with the specific mandate in *Fineman, supra,* 272 *N.J.Super.* at 620, 640 *A.2d* 1161.

The Nursing Practice Act primarily sets forth qualifications for nurses and nursing schools. Nothing in the language of the Act expressly prohibits a non-nurse from administering medication. *N.J.S.A.* 45:11–37(a), however, does prohibit the practice of nursing without a license. Although plaintiff does not specify the particular provision of the Act that Barreca allegedly violated, this prohibition supposedly is the provision on which she relies, as it is the only provision in the Act that is relevant to her allegations.

*N.J.S.A.* 45:11–23(b) provides that the practice of nursing shall not "be construed to include services performed by ... technicians ... and such duties performed by said persons aforementioned

shall not be subject to rules or regulations which the board may prescribe concerning nursing."

Without considering whether the Act proscribed Barreca's conduct, the motion judge addressed the restriction on the scope of the Act to determine whether the Act applied to Barreca, a cardiovascular technician. The motion judge found as a fact that Barreca was a cardiovascular technician. That finding is supported in the record, and plaintiff herself acknowledged in her deposition that Barreca was a cardiovascular technician. Despite plaintiff's counsel's assertion to the contrary, counsel cannot demonstrate that the motion judge erred in reaching this conclusion. As a cardiovascular technician, Barreca is, according to the plain language of the statute, exempt from the statute's mandates. A review of the regulations for the New Jersey Board of Nursing, cited by plaintiff, *N.J.A.C.* 13:37–1.1 to –14.14, fails to reveal that Barreca violated any regulation. Plaintiff also relied on *N.J.A.C.* 8:65–7.7, entitled administering or dispensing of narcotic drugs, a section of the regulations governing the Department of Health. Subsection (a) provides in part:

> The administering or dispensing directly (but not prescribing) of narcotic drugs listed in any schedule to a narcotic drug dependent person for 'detoxification treatment' or 'maintenance treatment' as defined in N.J.A.C. 8:65–11.1 shall be deemed to be within the meaning of the term 'in the course of professional practice or research'. . . .
>
> *[Ibid.]*

The terms of the provision clearly indicate that it does not to apply to Barreca. Plaintiff has not alleged that Barreca administered the nitroglycerin to a drug dependent person for detoxification treatment or maintenance treatment. Furthermore, nitroglycerin is not included in the Department of Health's schedules of controlled dangerous substances. Lastly, subsection (c) of the regulation provides:

> This section is not intended to impose any limitations on a physician or authorized hospital staff to administer or dispense narcotic drugs in a hospital to maintain or detoxify a person as an incidental adjunct to medical or surgical treatment of conditions other than addiction. . . .
>
> *[Ibid.]*

This section does not apply to Barreca's administering nitroglycerin to a heart patient. Nowhere can we find any law, regulation, or other expression of public policy that can be read to imply that technicians are not allowed to administer nitroglycerin to heart patients. In any case, there is certainly no clear mandate of public policy that supports such a conclusion.

Plaintiff also alleged that Barreca violated public policy by interfering with her nursing judgment. Plaintiff's brief in opposition to defendants' motion offers:

[I]t is certainly the public policy of the State of New Jersey that people who are neither trained doctors nor trained nurses, should not try to control and direct a trained nurse's medical actions. Trying to stop a trained nurse from administering a dosage of medication proscribed by a trained doctor, or telling a trained nurse what amount of electricity should be used to shock a patient experiencing irregular heart rhythms, is certainly a matter of public concern.

At oral argument before the motion judge, plaintiff's counsel made the same argument:

[Plaintiff's] beliefs were that by interfering with her judgment the conduct of Mr. Barreca violated the public policy of this state which was for her to be able to render appropriate care to her patients as she is licensed to do as a practicing nurse. That, your Honor, is the source of the public policy and the source for her reasonable belief that her claims, that her complaints were of something that was being done that was improper by Mr. Barreca.

Again, plaintiff has not provided this court with any specific sources from which we can infer a clear mandate of public policy.

### A.

Plaintiff maintains that she need not identify an actual statute or public policy but that she only need possess a reasonable belief that a law or policy has been violated. In a supplemental brief on appeal, plaintiff argues that our decision in *Mehlman v. Mobil Oil Corp.*, 291 *N.J.Super.* 98, 676 *A.*2d 1143 (App.Div.1996), supports her position. Like *Abbamont* and *Young*, *Mehlman* explains that a CEPA plaintiff need not "know, to a legal certitude, the precise contours and components of the public policy." *Id.* at 122, 676 *A.*2d 1143. We conclude, however, that plaintiff's belief that a

violation of public policy had occurred was not, as a matter of law, reasonable.

Plaintiff did not establish that she had a *reasonable* belief that Barreca was violating a clear mandate of public policy, as required under CEPA. *See, e.g., Abbamont v. Piscataway Township Bd. of Educ.,* 269 *N.J.Super.* 11, 24, 634 *A.*2d 538 (App.Div.1993), *aff'd,* 138 *N.J.* 405, 650 *A.*2d 958 (1994). In *Abbamont,* we found a clear mandate of public policy in the "New Jersey Industrial Arts Education Safety Guide" pertaining to outdoor air supply and ventilation requirements for industrial arts classrooms. *Ibid.* We held that Abbamont's reliance on the Safety Guide was sufficiently specific to support his CEPA claim. *Id.* at 23, 634 *A.*2d 538. We came to this conclusion despite the fact that Abbamont did not know to a legal certainty at the time that he made his complaint that his employers were violating that specific policy.

■ In *Mehlman, supra,* we emphasized that "[t]he statute requires the employee to have reasonably believed that the employer's conduct had *either* violated a law, rule or regulation, *or* had been incompatible with a clear mandate of public policy." *Id.* at 123, 676 *A.*2d 1143. Furthermore, "[t]he *sine qua non* of a CEPA claim is not the actual occurrence of a violation of promulgated authority or public policy, but rather the existence of *a reasonable belief to the effect that such authority or policy has been breached." Ibid.* (emphasis added).

*Mehlman* involved Mobil Oil's discharge of Mehlman, Mobil's director of toxicology and manager of the environmental health and science laboratory. Mehlman's duties included "representing Mobil on toxicology matters and providing 'toxicologic[al] and regulatory advice for prudent business decisions.'" *Id.* at 106, 676 *A.*2d 1143. Upon learning that there were high concentrations of benzene in Mobil gasoline sold in Japan, Mehlman told Mobil officials that the "concentrations are too high." At the time, Mehlman did not know of any specific Japanese regulation that prohibited high concentrations of benzene. We found that:

> The clear mandate of public policy derived from federal regulations and New Jersey product liability law was effective in Japan through the operation of the Japanese Petroleum Association guideline and the Japanese Environmental Agency Notification.
>
> [*Id.* at 122, 676 *A.*2d 1143.]

The inferences made by Mehlman that led him to believe that there was a violation of public policy were reasonable. Thus, *Mehlman* does not modify *Abbamont* or *Fineman.* *Mehlman* reiterates that an employee's belief that public policy is being violated by his employer must be reasonable.

Plaintiff, however, has not demonstrated that her belief that Barreca had violated public policy was reasonable. *See Mehlman, supra,* 291 *N.J.Super.* at 123, 676 *A.*2d 1143; *see also Chelly v. Knoll Pharmaceuticals,* 295 *N.J.Super.* 478, 481, 685 *A.*2d 498 (App.Div.1996) (affirming a trial court's determination that plaintiff's belief that his employer had violated a clear mandate of public policy was not reasonable).

Here, plaintiff has not shown us a clear mandate of public policy that would prohibit any of the actions that she alleges that Mr. Barreca performed. Plaintiff presents no guide, administrative code, judicial authority, legislation, etc., to support her claim that defendants violated a clear mandate of public policy. *See, e.g., Chelly, supra,* 295 *N.J.Super.* at 488–89, 685 *A.*2d 498 ("[t]he sources of such 'specific expressions' or 'clear mandates' are statutes, regulations and judicial decisions, and may 'in certain instances,' include a professional code of ethics").

As noted, a judge considering a CEPA claim must first, as a matter of law, "find and enunciate the specific terms of a statute or regulation, or the clear expression of public policy, which would be violated if the facts as alleged are true." *Fineman, supra,* 272 *N.J.Super.* at 620, 640 *A.*2d 1161. The motion judge announced her conclusion at oral argument: "I am finding that plaintiff has failed to identify a specific public policy or statute which was

violated by Mr. Barreca." Based on the record, we agree with that conclusion.[6]

In *Abbamont*, we concluded that a CEPA claimant "need only have a reasonable, objective belief that there was a specific violation." 269 *N.J.Super.* at 23, 634 *A.*2d 538. *See also Young v. Schering Corp.*, 275 *N.J.Super.* 221, 233, 645 *A.*2d 1238 (App.Div. 1994) (holding that a CEPA plaintiff "must show that his belief that illegal conduct was occurring had an objectively reasonable basis in fact—in other words that, given the circumstantial evidence, a reasonable lay person would conclude that illegal activity was going on."). (quoting *Littman v. Firestone Tire & Rubber Co.*, 709 *F.Supp.* 461, 470 (S.D.N.Y.1989)), *aff'd*, 141 *N.J.* 16, 660 *A.*2d 1153 (1995). *Fineman* and *Abbamont*, however, instruct that the court must first determine whether there exists a clear expression of law or public policy, and only then will the factfinder consider whether the plaintiff reasonably believed that a violation of that law or policy has occurred. In each of those cases, we identified the law or policy at issue and then considered whether the plaintiff's belief that a violation had occurred was reasonable. *Fineman, supra,* 272 *N.J.Super.* at 623–34, 640 *A.*2d 1161; *Abbamont, supra,* 269 *N.J.Super.* at 24–25, 634 *A.*2d 538.

█ Plaintiff's reliance on *Mehlman, supra,* is misplaced. The court in *Mehlman* found a "clear mandate of public policy" derived from federal regulations and New Jersey product liability law. This clear mandate was applicable in Japan through "the operation of the Japanese Petroleum Association guideline and the Japanese Environmental Agency Notification." 291 *N.J.Super.* at

---

[6] The motion judge did not address plaintiff's allegations that Barreca had violated the LAD. Plaintiff acknowledged in her deposition, however, that she made no complaints concerning Barreca's allegedly preferential treatment of Mike Siemers. Her co-workers complained only that they needed to go through Siemers if they wanted Barreca to accede to their requests. Based upon the evidence in the record that plaintiff had no viable claim predicated upon a LAD violation, the failure of the motion judge to specifically refer to that component of plaintiff's complaint was not error.

122, 676 *A*.2d 1143. Here, plaintiff cannot point to a clear mandate of public policy that was being broken by defendants. In the absence of such a public policy, plaintiff's claim that she reasonably believed that such a violation had occurred must fall on deaf ears.

### B.

Prior decisions of this court instruct that after establishing a reasonable belief of illegal activity, a CEPA plaintiff must next demonstrate: (1) that she disclosed or threatened to disclose the activity to a supervisor or public body;[7] (2) that she was fired; and (3) that there exists a causal connection between the whistle-blowing activity and the termination, i.e., "a retaliatory motive played a part in the adverse employment [action]." *Young, supra,* 275 *N.J.Super.* at 233, 645 *A*.2d 1238 (quoting *Littman, supra,* 709 *F.Supp.* at 470).

With respect to this standard, the motion judge in the instant matter declared:

I am saying that she has failed to demonstrate the nexus of causation that is required in view of the fact that there were three other acts that followed the confrontation, if you will, or the management discussion that they had. I will specifically point to the two inappropriate statements that she made and the operation of the Quinton without supervision or authorization.

I am finding under the facts of this case, and I am balancing the facts of this case, that I think the case is ripe for summary judgment, that there are no material issues of fact to be presented to a jury for a determination.

Since we have concluded that the motion judge correctly determined that plaintiff was not a whistleblower under CEPA, any additional evaluation of plaintiff's CEPA claim and the motion

---

[7] In *Mehlman,* the court specifically noted:

Furthermore, although "internal expressions of disagreement with corporate policy" are insufficient to establish a claim of wrongful discharge under *Pierce, House v. Carter–Wallace, Inc.,* 232 *N.J.Super.* 42, 51, 556 *A*.2d 353 (App.Div.) *certif. denied,* 117 *N.J.* 154, 564 *A*.2d 874 (1989), an employee need not communicate his belief to anyone outside of his company under either *N.J.S.A.* 34:19–3a or 34:19–3c.

[*Mehlman, supra,* 291 *N.J.Super.* at 124 n. 12, 676 *A*.2d 1143.]

judge's conclusions in reference thereto, particularly the judge's conclusion that there was no nexus between the alleged whistle-blower activity and the ultimate termination, is unnecessary.

## IV

As noted, the motion judge dismissed counts two, three, six, seven, and eight, concluding that each of those claims was barred under the CEPA waiver provision as set out in *N.J.S.A.* 34:19–8. That part of the act specifically provides:

> Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or under any collective bargaining agreement or employment contract; except that the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law.
>
> [*Ibid.*]

"The causes of action that fall within this waiver provision are those causes of action that are directly related to the employee's termination due to disclosure of the employer's wrongdoing." *Young, supra,* 275 *N.J.Super.* at 238, 645 *A.*2d 1238 (citing *Casper v. Paine Webber Group, Inc.,* 787 *F.Supp.* 1480, 1509 (D.N.J.1992), and *Catalane v. Gilian Instrument Corp.,* 271 *N.J.Super.* 476, 493, 638 *A.*2d 1341 (App.Div.), *certif. denied,* 136 *N.J.* 298, 642 *A.*2d 1006 (1994)). Claims that involve collateral issues and "require different proofs than those needed to substantiate" a CEPA claim, however, "are not within the category of actions that are deemed to be waived." *Young, supra,* 275 *N.J.Super.* at 238, 645 *A.*2d 1238 (citing *Flaherty v. The Enclave,* 255 *N.J.Super.* 407, 413–14, 605 *A.*2d 301 (Law Div.1992)). A claim must have a basis independent of the CEPA claim in order to be exempt from the waiver provision. *See Young, supra,* 275 *N.J.Super.* at 239, 645 *A.*2d 1238.

We find that the motion judge correctly determined that the causes of action embodied in counts two, three, six, seven, and eight were waived under the CEPA waiver provision.

## V

Plaintiff also contends that the motion judge erred when she granted summary judgment on counts four and five, alleging a breach of the employment contract between plaintiff and defendants.

Plaintiff's claims under counts four and five are predicated on the existence of an express or implied contract of employment. Absent an employment contract, an employee is terminable at the will of her employer. *See Witkowski v. Thomas J. Lipton, Inc.,* 136 *N.J.* 385, 397, 643 *A.*2d 546 (1994). There exists a presumption that employees are at-will. *Id.* at 398, 643 *A.*2d 546. An employer may discharge an at-will employee "for good reason, bad reason, or no reason at all." *Id.* at 397, 643 *A.*2d 546.

The Supreme Court has announced that, "[a]n employment manual providing terms and conditions of employment that include grounds and procedures for dismissal can create an employment contract." *Id.* at 392, 643 *A.*2d 546. Yet, a clear and straightforward disclaimer may "overcome the implication that [an] employment manual constitutes an enforceable contract of employment." *Nicosia v. Wakefern Food Corp.,* 136 *N.J.* 401, 412, 643 *A.*2d 554 (1994)(citing *Woolley v. Hoffmann–La Roche, Inc.,* 99 *N.J.* 284, 309, 491 *A.*2d 1257, *modified,* 101 *N.J.* 10, 499 *A.*2d 515 (1985)). The employee manual must "prominently and unmistakably" disclaim promises regarding terms of employment. *Nicosia, supra,* 136 *N.J.* at 412–13, 643 *A.*2d 554 (citing *Woolley, supra,* 99 *N.J.* at 307, 491 *A.*2d 1257). A disclaimer must be enunciated "in accordance with the reasonable expectations of the employees" and, hence, must "be expressed in language 'such that no one could reasonably have thought [the manual] was intended to create legally binding obligations.'" *Nicosia, supra,* 136 *N.J.* at 413, 643 *A.*2d 554 (quoting *Woolley, supra,* 99 *N.J.* at 307, 491 *A.*2d 1257). A disclaimer must also be prominently displayed. It must be sufficiently conspicuous that a reasonable person ought to

have noticed it. *Id.* at 415, 643 *A.*2d 554. As we most recently noted in *Jackson v. Georgia–Pacific Corp.*, 296 *N.J.Super.* 1, 15, 685 *A.*2d 1329 (App.Div.1996):

> The disclaimer must, then, be both "clear" and "prominent" so that the employee "unmistakably" understands that the manual provisions will not bind the company. Although the Supreme Court in *Nicosia* noted that to make such a determination consideration should be made of the physical appearance of the disclaimer, such as its typeface, point size, heading, and the degree to which it is "separated from or set off in a way to attract attention," 136 *N.J.* at 415, 643 *A.*2d 554, we do not read anything in *Nicosia*, and certainly nothing in *Woolley*, that requires some particular bold type, set-off, or symbol to alert the employee. *See Nicosia, supra,* 136 *N.J.* at 416, 643 *A.*2d 554 ("the requirement of prominence can be satisfied in a variety of settings, and . . . no single distinctive feature is essential *per se* to make a disclaimer conspicuous. . . .").
>
> Here, no such bold type, set-off or separate highlighting symbol appears in version nine. But, to us, just as effective is the placement of the disclaimer.
> [*Id.* at 15, 685 *A.*2d 1329.]

*Woolley* made clear that, regarding termination, a disclaimer must specify that "the employer continues to have the absolute power to fire anyone with or without good cause." 99 *N.J.* at 309, 491 *A.*2d 1257. *See also Nicosia, supra,* 136 *N.J.* at 413, 643 *A.*2d 554. This requires an employer to apprise its employees expressly that they may be terminated at will. *Preston v. Claridge Hotel & Casino,* 231 *N.J.Super.* 81, 85, 555 *A.*2d 12 (App.Div.1989); *Nicosia, supra,* 136 *N.J.* at 413, 643 *A.*2d 554.

CMC's employee handbook provides on the *first* page:

> This employee handbook is for informational purposes. It does not either directly or indirectly constitute an employment contract between the hospital and the employee. The contents of this handbook are not hospital personnel policies themselves, but an explanation of our personnel policies. If you desire to see the policies, please contact your immediate supervisor. The contents of this handbook are subject to change at any time at the discretion of hospital administration.

Defendants contend that this statement, in conjunction with the statement in the disciplinary guidelines section that an employee may still be terminated with or without cause at CMC's discretion, constitutes a disclaimer of any implied promises regarding termination.

CMC's employee handbook covers several diverse areas including benefits, selection of employees, attendance, wages, hours

worked, leaves of absence, and discipline. CMC's disciplinary guidelines include a comprehensive expression of termination practices. The first paragraph of the guidelines reads, *"[t]he employment of all employees is for no stated term and every employee is subject to termination at the will of the hospital.* However, the hospital will attempt, where practicable, to follow the below mentioned disciplinary guidelines." (emphasis added).

The guidelines provide five disciplinary actions: verbal reprimand, which is not part of the formal disciplinary process; written reprimand, the initial step of the formal disciplinary process; suspension; suspension pending termination; and termination. Suspension is warranted if an employee has failed to correct behavior after a written reprimand. Indefinite suspension pending termination is an option if there is cause for immediate termination but the employee's supervisor wants to investigate the matter further.

The guidelines provide the following about termination:

a. First and foremost, termination denotes a failure on the part of the employee to do what is expected by the employer. In this sense, it is the final step of the disciplinary process resulting from the employee not accepting the condition of employment.

b. Secondly, certain actions which are by their very nature hazardous to patients, employees and other members of the hospital family are recognized as grounds for termination. These actions include, but are not limited to:

— abandonment of job for three consecutive work days

— intentionally fighting and/or inflicting bodily harm

— indecent or immoral conduct (conduct that is not supportive to the hospital's goals and objectives)

— conviction of a felony

— falsification of an official hospital document (by omission or commission)

— gross inefficiency

— possession of firearms or weapons on hospital premises

Any disciplinary action taken by a supervisor beyond a written reprimand will be done after consulting with either the Vice President of Human Resources or the Assistant Director of Personnel.

If the offense is corrected and there is no reoccurrence of the offense within a year of the last disciplinary action, then all record of the disciplinary action will be removed from the employee's personnel file.

The guidelines also provide a chart of penalties for the first, second, and third instances of numerous delinquencies. For example, for the first instance of making false statements which are slanderous or defamatory about other employees or the hospital, an employee may be suspended or suspended pending termination. For the second instance of such conduct, an employee may be terminated. For the first instance of unauthorized disclosure or use of official hospital or patient information, an employee may be issued a written reprimand, suspended or suspended pending termination. For a second offense of this type, an employee can be suspended, suspended pending termination or terminated. If an employee endangers the well-being of any person, the employee may be subjected to any of the four formal disciplinary actions for the first offense. The same is true of misuse of the computer system. Regarding this chart, the guidelines offers, *"[t]he foregoing listing of penalty guidelines is not meant to be all inclusive and does not prohibit the Hospital from terminating employees with or without cause in its discretion."* (emphasis added).

Although CMC's disciplinary guidelines appear to provide a comprehensive pronouncement of its termination policy, it does not appear to be sufficiently definitive to support the proposition that CMC employees could reasonably expect it to represent an employment contract. The handbook does not include an express mandate as in *Nicosia* that all preliminary steps be exhausted before an employee can be terminated for cause.

We also note that there exists no evidence in the record concerning the preparation or distribution of the handbook. In *Woolley, supra,* 99 *N.J.* at 297–301, 491 *A.*2d 1257, the Supreme Court considered whether and under what circumstances a company employee manual will create certain employment protections even in the face of an otherwise at-will employment relationship. Under *Woolley,* if a discharged employee can demonstrate that a company manual was widely distributed and contained job-security and disciplinary procedures that an employee reasonably could consider as establishing reciprocal rights and obligations, and the

employee in reliance thereof continues employment, the company manual may be considered an implied contract of employment and the employee entitled to rely upon the protections contained therein. *Id.* at 309, 491 *A.*2d 1257. Although the Supreme Court also cautioned that the mere distribution of a company manual governing terms and conditions of employment does not *ipso facto,* create such a contract. *Ibid.* Clearly, distribution of the manual is a prong which must be considered in evaluating the effect and meaning of the employment manual. Here, however, plaintiff has offered no evidence to permit an evaluation of that prong of the equation.

The paramount factor in determining whether the manual does, in fact, constitute an employment contract is the reasonable expectations of the employees. *Id.* at 299, 491 *A.*2d 1257. One consideration in ascertaining these reasonable expectations is whether the manual contains "an express or implied promise concerning the terms and conditions of employment." *Witkowski, supra,* 136 *N.J.* at 393, 643 *A.*2d 546 (quoting *Gilbert v. Durand Glass Mfg. Co., Inc.,* 258 *N.J.Super.* 320, 330, 609 *A.*2d 517 (App.Div.1992)). For instance, if an employment manual makes references to "maximum job security," we will be more inclined to find an employment contract. *See id.* at 395, 643 *A.*2d 546 (citing *Preston, supra,* 231 *N.J.Super.* at 87, 555 *A.*2d 12).

Such an implied promise may be found in the definiteness and comprehensiveness of the employer's termination policy. *Ibid.* In *Nicosia, supra,* the Supreme Court predicated a finding of an employment contract on a mandate in the employer's disciplinary procedure that all disciplinary steps must be taken before an employee can be discharged for cause. 136 *N.J.* at 409, 643 *A.*2d 554. The procedural safeguards did not apply to expressly enumerated conduct that warranted immediate discharge, including theft of company property, sexual harassment, gross insubordination and breach of confidentiality. *Ibid.* An employee manual may be deemed an employment contract even if its disciplinary

procedures do not set forth every "just cause" ground for discharge. *See Witkowski, supra,* 136 *N.J.* at 394, 643 *A.*2d 546.

The motion judge did not address whether the disclaimer clause negated any implied promise regarding employee termination. She simply concluded that the disciplinary guidelines of defendants' employment handbook were a sufficient basis to terminate plaintiff. Additionally, the motion judge did not render an opinion on whether the handbook disclaimer was sufficient to constitute a disclaimer of any implied promise regarding termination. The judge erred in not addressing those issues; yet, she correctly concluded that plaintiff was rightly terminated. We reach the same conclusion.

The disclaimer, when read together with the disciplinary procedure, clearly indicates that an employee's position is one involving some risk. Maximum job security is not assured.

In reaching this conclusion, we note no evidence regarding the preparation of, or the distribution of, the employee handbook. Both are factors that we consider in determining the reasonableness of an employee's belief that the handbook represents a binding, legally enforceable commitment. *Id.* at 393, 643 *A.*2d 546. Wide distribution to many employees will support the inference that the manual constitutes an employment contract. *Witkowski, supra,* 136 *N.J.* at 395, 643 *A.*2d 546; *Nicosia, supra,* 136 *N.J.* at 408, 643 *A.*2d 554.

## VI

In part I.B of this opinion, we noted that on September 17, 1992, plaintiff attended a meeting with CMC executive personnel to discuss plaintiff's job performance, particularly: (1) unauthorized operation of the Quinton; (2) an alleged breach of patient confidentiality; and (3) an allegation that plaintiff had made a disparaging remark about Bageac to other hospital personnel. Plaintiff's termination was attributed to the cumulative effect of those job performance criticisms.

Having concluded that CMC's employee manual does not establish a contractual employment relationship, express or implied, between CMC and plaintiff, plaintiff was clearly an employee at-will terminable for any reason by CMC. Thus, it is unnecessary to analyze the basis for CMC's contentions on the second and third enumerated reasons for termination nor the certifications of plaintiff referencing those allegations.

Likewise, plaintiff's contention that Bageac, a cardiologist with admitting privileges at CMC, should be deemed an employer of plaintiff and, as such, liable under CEPA is rendered moot by our conclusion that plaintiff was an employee at-will and that her termination was not in retaliation for whistleblowing activities, as defined in *N.J.S.A.* 34:19–3.

## VII

Plaintiff challenges the motion judge's denial of her motion for leave to amend her complaint to include a claim for tortious interference with a contractual relationship and prospective economic advantage. A pleading may be amended after responsive pleadings have been filed only by leave of the court. *R.* 4:9–1. Leave to amend should freely be given in the interests of justice. *Ibid.; City Check Cashing v. National State Bank* 244 *N.J.Super.* 304, 308–09, 582 *A.*2d 809 (App.Div.), *certif. denied,* 122 *N.J.* 389, 585 *A.*2d 391 (1990). In this instance, however, plaintiff's motion for leave to amend her complaint followed the grant of summary judgment to defendants on all counts of plaintiff's complaint as originally filed.

Plaintiff has not provided this court with a copy of the specific complaint amendment that she sought to file alleging a claim for interference with a contract or prospective economic advantage. Plaintiff's brief on appeal sets forth the elements of the causes of action she sought to pursue: (1) existence of a contract of protectable right; (2) intentional and malicious interference; (3) causation; and (4) damages. Plaintiff argues that allegations asserted in her original complaint would support her action of tortious

interference. We disagree. Plaintiff's proposed action was dependent upon the same facts as her CEPA claim. As such, had a count alleging interference with a contract or prospective economic advantage been included in plaintiff's original complaint, it would, like her other tort claims, have been deemed waived under *N.J.S.A.* 34:19–8. *See* section IV, *supra.* Accordingly, the motion judge properly denied plaintiff's motion.

Affirmed.